### UNITED STATES v. CAROLENE PRODUCTS CO.
### No. 2234.

District Court, S. D. Illinois, S. D.
Feb. 13, 1934.

Frank K. Lemon, U. S. Atty., and Marks Alexander, Asst. U. S. Atty., both of Springfield, Ill.

Hoyne, Niemeyer, Murdock & Reilly, of Chicago, Ill. (Geo. N. Murdock, of Chicago, Ill., of counsel), for defendant.

FITZHENRY, Circuit Judge.

This is an information against defendant, a corporation, charging it in the first count with having unlawfully shipped, in interstate commerce, from Litchfield, Ill., to a consignee at Muncie, Ind., over the lines and routes of the Railway Express Agency, "a certain adulterated article of food injurious to the public health, to wit, certain filled milk, to wit, one case of 'Carolene' being then and there a product of condensed and concentrated skim milk, to which there had theretofore been added and with which there had theretofore been blended and compounded a certain fat and oil other than milk fat, to wit, the said 'Carolene' then and there, to wit, at the time and place aforesaid, was in imitation or semblance of, to wit, milk, cream, skim milk, condensed milk and concentrated milk, to wit, the said filled milk, to wit, the said 'Carolene' not then and there being a distinct proprietary food compound," then negativing the exception as to infants' food, charging, "said shipment in interstate commerce as aforesaid of the said filled milk, to wit, the said 'Carolene' was then and there unlawful and prohibited and in violation of the Act of Congress approved March 4, 1923, entitled, 'An Act to Prohibit the Shipment of Filled Milk in Interstate or Foreign Commerce'; contrary to the form of the statute," etc. USCA, title 21, §§ 61, 62, 63.

The information contains three counts, the second and third of which are substantially the same as the first. The gist of the information is that defendant is the manufacturer of a food product, being a compound of skimmed milk and cocoanut oil, and shipped some of its product, in interstate commerce, from Litchfield, Ill., to Muncie, Ind., in violation of the so-called "Filled Milk Act."

Defendant has demurred to the information, and charges that the statute under which the prosecution is had is unconstitutional and void for the following reasons:

1. The statute creates a conclusive presumption that: (1) Filled milk is an adulterated article; (2) it is injurious to the public health; (3) that its sale constitutes a fraud upon the public; and thereby denies defendant the right to take issue upon these material facts and to prove it is not an adulterated article, under the laws of the United States; that it is not in fact injurious to the public health, and that its sale in no way constitutes a fraud upon the public; and thereby deprives defendant of its property without due process of law, in violation of the Fifth Amendment to the Constitution.

2. That the statute is invalid because it prohibits the shipment of defendant's product in interstate commerce, but does not forbid the transportation in interstate commerce of mixtures and compounds of milk and mineral or vegetable fats in imitation or semblance of butter, and is therefore arbitrary and unreasonable and deprives' defendant of its property without due process of law.

3. Because the statute is invalid in that Congress in adopting it assumed the powers of the Judicial Branch of the government as defined by the Constitution of the United States.

4. The statute is unconstitutional because under the power given to Congress by the Constitution to regulate interstate commerce (article 1, § 8, cl. 3), it has prescribed for the actual prohibition in interstate commerce

of an article which is in itself healthful and nutritious.

5. Because defendant is denied a hearing to which it is entitled under the Pure Food and Drugs Act, and none is provided by the so-called "Filled Milk Act"; that before defendant can be deprived of its rights it must have notice and a reasonable opportunity to be heard in defense of its rights.

Section 1 of the so-called Filled Milk Act (21 USCA § 61), paragraph (a), defines the term "person"; (b) describes "interstate or foreign commerce"; and (c) defines the term "filled milk" as meaning any milk, cream, or skimmed milk, whether condensed or otherwise, to which has been added, or which has been blended or compounded with, any fat or oil other than milk fat, so that the resulting product is in imitation or semblance of milk, cream, or skimmed milk, whether or not condensed, evaporated, concentrated, powdered, dried, or desiccated. The paragraph contains an exception covering and describing so-called infant foods.

Section 2 (21 USCA § 62) declares filled milk, as defined, to be an adulterated article of food, injurious to the public health, and its sale constitutes a fraud upon the public; that it shall be unlawful for any person to manufacture it within any territory or possession or the District of Columbia, or to ship the product or deliver it for shipment in interstate or foreign commerce.

In other words, the act recognizes milk, cream, or skimmed milk, condensed or otherwise, to be entirely legitimate and innocuous articles and proper commodities for interstate commerce, but when the well-known article of skimmed milk has had some harmless vegetable oil or fat added to it, then it becomes adulterated, is injurious to the public health, and a fraud upon the public, notwithstanding the recognition of it by the Pure Food and Drugs Law as a wholesome article of food, entitled to enter interstate commerce, provided it is labeled and branded so that a purchaser, in actual commerce, may know exactly what it is and its nature. USCA, title 21, § 10, Act of June 20, 1906, c. 3915, § 8.

Section 7 of the Pure Food and Drugs Act of 1906 (USCA, title 21, § 8), in force at the time of the passage of the so-called Filled Milk Act, defines "adulterated articles" as follows:

"For the purposes of sections 1 to 15, inclusive, of this title, an article shall be deemed to be adulterated;

"Drugs. * * *

"Confectionery. * * *

"Food. In the case of food:

"*Injurious mixtures.*—First. If any substance has been mixed and packed with it so as to reduce or lower or injuriously affect its quality or strength.

"*Substitutes.*—Second. If any substance has been substituted wholly or in part for the article.

"*Valuable constituents abstracted.*—Third. If any valuable constituent of the article has been wholly or in part abstracted.

"*Damage or inferiority concealed.*— Fourth. If it be mixed, colored, powdered, coated, or stained in a manner whereby damage or inferiority is concealed.

"*Deleterious ingredients; preservatives in shipment conditionally excepted.*—Fifth. If it contain any added poisonous or other added deleterious ingredient which may render such article injurious to health. When in the preparation of food products for shipment they are preserved by any external application applied in such manner that the preservative is necessarily removed mechanically, or by maceration in water, or otherwise, and directions for the removal of said preservative shall be printed on the covering or the package, the provisions of sections 1 to 15, inclusive, of this title shall be construed as applying only when said products are ready for consumption.

"*Animal or vegetable substances unfit for food; products of animals diseased or having died otherwise than by slaughter.*—Sixth. If it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter."

The later act (Act of March 4, 1923) contains no express provision with reference to repeal of former statutes or preventing it from operating upon sections 7 and 8 of the Act of June 30, 1906 (USCA, title 21, §§ 8 and 10). The last paragraphs of the latter section expressly exclude from the operation of the other provisions of the Pure Food and Drugs Law:

" * * * mixtures or compounds which may be now or from time to time hereafter known as articles of food, under their own distinctive names, and not an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement

of the place where said article has been manufactured or produced.

"Second. In the case of articles labeled, branded, or tagged so as to plainly indicate that they are compounds, imitations, or blends, and the word 'compound,' 'imitation,' or 'blend,' as the case may be, is plainly stated on the package in which it is offered for sale. The term blend as used herein shall be construed to mean a mixture of like substances, not excluding harmless coloring or flavoring ingredients used for the purpose of coloring and flavoring only. * * * "

■■ The passage of the Act of March 4, 1923, certainly repealed those sections, so far as the subject of "filled milk" is concerned, regardless of its effect upon other subjects. It was undoubtedly the intention of Congress to single out skimmed milk, and prohibit its transportation in interstate commerce, if anything wholesome, healthful, or otherwise be added to it, declaring it to be injurious to the public health, adulterated, and a fraud upon the public. It is common knowledge that skimmed milk constitutes a large proportion of the entire milk production.

■ The constitutionality of the Filled Milk Act is attacked, and we naturally look to the reports of the committees of Congress and the debates to ascertain the objects and purposes of the legislation. Duplex Printing Press Co. v. Deering et al., 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196. Some excerpts from the report of the Committee on Agriculture and Forestry of the Senate upon the measure, when the bill was being considered by that body, are very enlightening and will be found in the margin.*

---

* (Report of Committee on Agriculture and Forestry, Senate, Jan. 3, 1923; 67th Congress, 4th Session, Report 987.)

"It is a compound of skimmed milk and cocoanut oil. The manufacturers buy the whole milk, separate the butter fat, and sell the latter for cream or use it in the manufacture of butter. The skimmed milk is then mixed with from 3 to 4 per cent. cocoanut oil, and this mixture is then reduced by evaporation to about half its bulk. The cocoanut oil is reduced in bulk very little, if any, by the process of evaporation, so that when the compound is ready for canning it consists of skimmed milk reduced to about half its bulk, and, as the cocoanut oil was not reduced in the process of evaporation, from 6 to 8 per cent. of the oil. The compound is an exact imitation of evaporated milk, in color, consistency, smell, and taste, and the difference between it and evaporated milk can only be ascertained by chemical analysis. The compound can be manufactured for less than half of the cost of evaporated milk."

Under the head of "Method of Handling and Marketing," the report continues:

"The pure food and drugs act (sec. 7) provides that an article of food shall be considered adulterated 'if any substance has been mixed and packed with it so as to reduce or lower or injuriously affect its quality or strength,' or, 'if any substance has been substituted wholly or in part for the article,' or, 'if any valuable constituent of the article has been wholly or in part abstracted,' and shall be considered misbranded (sec. 8) 'if it be an imitation of or offered for sale under the distinctive name of another article.' However, section 8 of this act has a proviso under which the manufacturers of filled milk claim the right to manufacture it, to the effect that an article shall not be considered adulterated or misbranded 'in the case of * * * compounds * * * under their own distinctive names, and not an imitation of or offered for sale under the distinctive name of another article.'

"The manufacturers of filled milk do not label their cans as 'milk,' as that would be a violation of the act, but use such trade names as 'Hebe,' 'Carolene,' 'Majal,' 'Silver Key,' 'Enzo,' 'Nyko.' The compound is put up in the same size and style of cans as the genuine evaporated or condensed milk and is carried by the retail dealers on their shelves side by side with the genuine product. *Your committee does not doubt that the sale of filled milk as at present carried on is in violation, if not of the letter, of the spirit of the pure food and drugs act. This act cannot regulate the conduct of the retail dealer. He can buy this compound for about 3 cents per 1-pound can less than he is obliged to pay for the genuine article. Many instances were brought to the attention of your committee where retail dealers advertised the compound as 'Hebe Milk,' 'Silver Key Milk,'* etc., and investigations conducted in many of our large cities reveal that the dealers were selling the compound as being as good and better than regular evaporated milk. It was shown that the compound was largely sold in sections of cities inhabited by people unable to read the label and people of limited means.

"One of the great dangers incident to the marketing of filled milk lies in the bulk sales. The statistics for the past year show that the sale in bulk is now on the increase. When used in hotels and restaurants and for making ice cream, the consumer has no means of knowing what he is

504

It seems that the committee had given the manufacturers of compounds affected an opportunity to appear before it, and the report recites, in addition to what has heretofore been referred to, that among other contentions were that the compounds are wholesome and they are actually labeled and sold by the manufacturers for what they are. The committee, referring to those claims, said: "(2) There is no claim that the compound in and of itself is unwholesome. If used by the consumer in limited quantities, with an exact knowledge of its deficiencies, and the ability to supply these deficiencies, there would be little harm in its use. But we fear that such a condition does not obtain in practice, and are convinced that the use of the compound, as it is and will be sold, unless protected, is injurious to the public health."

The Illinois situation illustrates the rights which the Supreme Court of the United States was endeavoring to protect to the states in the cases of Hammer, U. S. Atty., v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 532, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, and Bailey v. Drexel Furniture Co., 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432. In Illinois the Supreme Court has held that the particular defendant in this case is engaged in a lawful business. People v. Carolene Products Co., 345 Ill. 166, 177 N. E. 698, 699. In Ohio the Legislature prohibited the business, and the Supreme Court, in Hebe v. Shaw, 248 U. S. 297, 39 S. Ct. 125, 63 L. Ed. 255, held that the state had the right to prohibit it in Ohio. The law in Illinois permits the business, and the effect of the Filled Milk Act would be to enforce legislation not of its own enactment upon the state of Illinois. The mere fact that some states may care to exercise certain police powers, and do so, is, as a matter of law, not of binding concern upon the state which does not care to have the same law.

Without the aid of the reports of the committees and the debates of Congress, it is apparent from a mere reading of the bill it is a plain attempt on the part of Congress not only to prohibit the manufacture and shipment in interstate commerce of filled milk in the territories and the District of Columbia, but to prohibit the manufacture, shipping, or delivery for shipment, of it to any common carrier in interstate commerce and thereby effect the same prohibition throughout the several states. It is true that its prohibition, outside of the District of Columbia and the territories, runs against the "shipping or delivery for shipment" of any compound in interstate commerce undoubtedly with the purpose of bringing the legislation within the constitutional grant to Congress "to regulate Commerce with foreign Nations, and among the several States, and with the Indian

getting, and a label could not protect against fraud in such a case. *If bulk shipments should be allowed, commercial chemists may discover a method by which the compound in bulk may be refilled into cans for retail sales within the limits of a State, and thus the whole object of the legislation be frustrated.*

"In recent years scientists have discovered food elements known as 'vitamines' which are highly essential to the growth and well-being of the human body. It has been found that such diseases as rickets, scurvy, serious eye diseases, beriberi, and even tuberculosis, may be traced to the lack of vitamines in the diet; in fact, the lack of vitamines reduces the whole vitality of the body and invites disease. Our chief source of vitamines is milk, and the vitamines are found almost wholly in the butter-fat of the milk. Four distinct kinds of vitamines have been discovered. The extraction of the butter-fat from the milk seems to leave in the skimmed milk only a trace of so-called vitamine A. * * *

"Vitamines are not produced by the cow, but are found in her food and concentrated in the milk. The human body does not produce them, but must receive them in the food. It follows, therefore, that a nursing mother who does not receive sufficient vitamines in her diet can not transmit healthful milk to her offspring. It is a curious fact that all vegetable oils and fats are wholly lacking in vitamines. It is a fact that there is in the United States considerable undernourishment of the population, especially in our larger cities. This would appear to be due in part at least to the fact that in our preparation of food for the market we have extracted at least in part valuable mineral elements and vitamines. It is therefore all the more necessary that we supply the vitamines in the milk. Milk is the one chief food of the Nation, and no adulteration of it or substitution for it should be permitted.

"* * * Your committee is of the opinion that it is impossible to prevent fraudulent use and sale of this compound, on account of the incentive of additional profit held out to the retail dealers, and no doubt in many cases due to the fact that the retail dealers themselves do not know wherein the compound differs from the genuine evaporated milk. * * *" (All italics ours.)

Tribes." Constitution, art. 1, § 8, cl. 3. In other words, it is as clear a prohibition against the transportation of the compound in interstate commerce as language can describe, and it makes any person guilty of violating its provisions subject to a fine of not to exceed $1,000, or imprisonment for not more than one year, or both.

By an examination of the committee report on the so-called "Filled Milk Bill" in the Senate, from which we have quoted above, we find that when Congress made the declaration that filled milk as therein defined "is an adulterated article of food, injurious to the public health and its sale constitutes a fraud upon the public," that it was doing so because one wholesome article of food had been added to another well-known and very common article of food, it was injurious to the public health, because it did not contain a suitable amount of vitamin A to make it especially desirable for feeding infants and nursing mothers; that its sale constitutes a fraud upon the public because certain retailers in various large cities had been guilty of its use in unfair competition with evaporated and condensed milk. Yet the Senate Committee held and made the express declaration that "there is no claim that the compound in and of itself is unwholesome"; but because of certain unfair competition on the part of local retailers in the city of Washington and in some of the large cities, in selling the compound for something just as good or better than condensed milk, that the article itself thereby became injurious to health and "a fraud upon the public."

When the matter was before the House, the Committee on Agriculture and Forestry, after its hearings, filed a report for the benefit of the House, in which Mr. Voight, the author of the bill, and for a majority of the committee (on page 6 of his report), said: "While the proposed bill will not prohibit the manufacture and sale of the compound within the limits of a State, the committee is of the opinion that the law prohibiting interstate shipment will suppress it, because a sufficient market cannot be found without such shipment, and also because a sufficient milk supply cannot be found in many States which would warrant engaging in the enterprise."

And further in his evidence at the hearings (page 13), in reply to a question by Mr. Ten Eyck, Mr. Voight said: "I want to stop the manufacture and the sale of this article so far as it can be done by this form of bill."

Congressional Record, p. 7595, 67th Congress, May 24, 1922.

It is very earnestly contended that the Congress may exert its control over interstate commerce in the shipment of common commodities to the extent of suppressing unfair competition. This was the exact question that was involved in Hammer, U. S. Attorney, v. Dagenhart, supra, where the Child Labor Law (39 Stat. 675) was held to be unconstitutional. There, the Act of September 1, 1916, prohibited the transportation in interstate commerce of the products of mines, or factories, in which within thirty days prior to removal children under the age of 14 were employed, or children between 14 and 16 were employed or permitted to work more than six days a week.

There are some states where the manufacture and sale of so-called filled milk, or food compounds, are perfectly legitimate and encouraged; there are others where they are prohibited. Such acts involve the exercise of plain police powers vested in the several states and not the federal government. The Supreme Court, in Hammer v. Dagenhart, supra, said:

"There is no power vested in Congress to require the states to exercise their police power so as to prevent possible unfair competition. Many causes may co-operate to give one state, by reason of local laws or conditions, an economic advantage over others. The commerce clause was not intended to give to Congress a general authority to equalize such conditions. In some of the states laws have been passed fixing minimum wages for women, in others the local law regulates the hours of labor of women in various employments. Business done in such states may be at an economic disadvantage when compared with states which have no such regulations; surely, this fact does not give Congress the power to deny transportation in interstate commerce to those who carry on business where the hours of labor and the rate of compensation for women have not been fixed by a standard in use in other states and approved by Congress.

"The grant of power to Congress over the subject of interstate commerce was to enable it to regulate such commerce, and not to give it authority to control the states in their exercise of the police power over local trade and manufacture.

"The grant of authority over a purely federal matter was not intended to destroy

the local power always existing and carefully reserved to the states in the Tenth Amendment to the Constitution."

Concluding a very enlightening discussion of the powers of Congress with reference to interstate commerce, the court then said: "In our view the necessary effect of this act is, by means of a prohibition against the movement in interstate commerce of ordinary commercial commodities to regulate the hours of labor of children in factories and mines within the states, a purely state authority. (Here, the food of infants and nursing mothers and unfair competition.) Thus the act in a two-fold sense is repugnant to the Constitution. It not only transcends the authority delegated to Congress over commerce but also exerts a power as to a purely local matter to which the federal authority does not extend. The far reaching result of upholding the act cannot be more plainly indicated than by pointing out that if Congress can thus regulate matters entrusted to local authority by prohibition of the movement of commodities in interstate commerce, all freedom of commerce will be at an end, and the power of the states over local matters may be eliminated, and thus our system of government be practically destroyed."

We realize that the opinion in Hammer v. Dagenhart, supra, is a so-called 5 to 4 decision. It was filed June 3, 1918, and affirmed the judgment of the District Court in enjoining the enforcement of the Child Labor Law. Four years later another case came before the Supreme Court, involving what was known as the Child Labor Tax Law (40 Stat. 1138–1140), enacted by Congress about nine months after the decision in the Hammer Case. That was a revenue measure, approved February 24, 1919, and the title of the heading in the Revenue Act was "Tax on Employment of Child Labor." The act imposed a tax of 10 per cent. of the net income of a person employing child labor without distinction as to the amount of the tax between an employer who employs one child one day and one who employs a large number for the entire year and which exempts from the tax an employer who did not know the child was under the age, etc.

The court held that it was quite apparent that the Child Labor Tax Law was designed to regulate child labor and not to collect revenue, as was manifest from its provisions; that it could not be sustained as a valid exercise of the taxing power under the Constitution merely because it was in substance a penalty for a violation of the regulations and was designated as a tax, even though the court will sustain as a taxing measure an act which imposes a tax so excessive as to prevent the act taxed.

In discussing that law, Mr. Chief Justice Taft, in Bailey v. Drexel Furniture Co., 259 U. S. 20, 42 S. Ct. 449, 450, 66 L. Ed. 817, 21 A. L. R. 1432, said: "In the light of these features of the act, a court must be blind not to see that the so-called tax is imposed to stop the employment of children within the age limits prescribed. Its prohibitory and regulatory effect and purpose are palpable. All others can see and understand this. How can we properly shut our minds to it?"

In discussing the case further (page 39 of 259 U. S., 42 S. Ct. 449, 451) the court said:

"The case before us cannot be distinguished from that of Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Congress there enacted a law to prohibit transportation in interstate commerce of goods made at a factory in which there was employment of children within the same ages and for the same number of hours a day and days in a week as are penalized by the act in this case. * * *

"In the case at the bar, Congress in the name of a tax which on the face of the act is a penalty seeks to do the same thing, and the effort must be equally futile.

"The analogy of the Dagenhart Case is clear. The congressional power over interstate commerce is, within its proper scope, just as complete and unlimited as the congressional power to tax, and the legislative motive in its exercise is just as free from judicial suspicion and inquiry. Yet when Congress threatened to stop interstate commerce in ordinary and necessary commodities, unobjectionable as subjects of transportation, and to deny the same to the people of a state in order to coerce them into compliance with Congress' regulation of state concerns, the court said this was not in fact regulation of interstate commerce, but rather that of state concerns and was invalid. So here the so-called tax is a penalty to coerce people of a state to act as Congress wishes them to act in respect of a matter completely the business of the state government under the federal Constitution. This case requires * * * the application of the principle announced by Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, 423, 4 L. Ed. 579, in a much-quoted passage:

" 'Should Congress, in the execution of its powers, adopt measures which are prohibited by the Constitution; or should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not intrusted to the government; it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land.' "

In the case of Bailey v. Drexel Furniture Co., supra, there was a single dissent. So that the reaffirmation of the holdings in Hammer v. Dagenhart, supra, makes the law laid down in that case more than the holding of a mere majority of the Court.

■ The Act of March 4, 1923 (21 USCA §§ 61–63), is clearly an attempted exercise of police power over local affairs under the guise of regulating interstate commerce. While involving a different subject-matter, it does involve the precise principle which was discussed and applied by the Supreme Court of the United States in Hammer v. Dagenhart, supra, and Bailey v. Drexel Furniture Co., supra.

The act of Congress in question at once strikes down a well-known lawful industry, one which theretofore was entitled to and had the protection of the Constitution and laws of the United States. It amounts to a taking of private property ostensibly for the public good without compensation, and deprives the defendant and others similarly situated of liberty and property, without due process of law.

■ The power to regulate commerce is not absolute, but is subject to the limitations and guaranties of the Constitution (Const. Amend. 5), among which are those providing that private property shall not be taken for public use without just compensation and that no person shall be deprived of life, liberty, or property without due process of law. Monongahela Navigation Co. v. United States, 148 U. S. 312, 336, 13 S. Ct. 622, 37 L. Ed. 463; United States v. Joint Traffic Ass'n, 171 U. S. 505, 571, 572, 19 S. Ct. 25, 43 L. Ed. 259; Adair v. United States, 208 U. S. 161, 28 S. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764.

■ "Property" is more than a mere thing which a person owns. It is elementary. It includes the right to acquire, use, and dispose of. The Constitution protects these essential attributes of property. Buchanan v. Warley, 245 U. S. 60, 38 S. Ct. 16, 62 L. Ed. 149, L. R. A. 1918C, 210, Ann. Cas. 1918A, 1201.

The Constitution makes no exception of any particular kind of property. Williams v. Mayor, etc., 2 Mich. 560.

The general police power is reserved to the states. The power to protect the public health and the public safety, to preserve good order and the public morals, to protect the lives and property of their citizens, "the power to govern men and things" within the limits of their dominions, by any legislation appropriate to that end and which does not encroach upon the rights guaranteed by the national Constitution, nor come in conflict with the acts of Congress passed in pursuance of that instrument, is a power originally and always belonging to the states, not surrendered by them to the general government nor directly restrained by the Constitution of the United States. Ency. U. S. Sup. Ct. Rep., Vol. 9, p. 475.

■ The police powers of the states, in so far as they relate to those internal affairs which have never been surrendered, are essentially complete, unqualified, and exclusive in the individual states, and cannot be assumed by the federal government. Ency., supra.

The Legislature of Illinois enacted a similar filled milk law, which was approved June 21, 1923. The Illinois Supreme Court, in People v. Carolene Products Co., supra, held it to be a violation of the Illinois Constitution and void. In that case it was said: "The Legislature has no authority to pronounce the performance of an innocent act criminal when the public health, safety, comfort, or welfare is not interfered with, Gillespie v. People, 188 Ill. 176, 58 N. E. 1007, 52 L. R. A. 283, 80 Am. St. Rep. 176, and may not, under the guise of protecting the public interests, arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. New State Ice Co. v. Liebmann (D. C.) 42 F.(2d) 913. No question of imitation or fraud is involved in this case, and the wholesomeness of Carolene is admitted. In People v. Price, 257 Ill. 587, 101 N. E. 196, 198, Ann. Cas. 1914A, 1154, this court said: 'It may be conceded the Legislature has no authority to forbid the sale of a known wholesome article of food.' "

So that the state of Illinois, in the exercise of its police powers, attempted to enact a statute upon this same subject which was set aside by the highest court in the state, and, at present, there is no such law in force and effect in that state.

Some time ago the Legislature of Ohio passed a similar law. Suit was commenced

to enjoin the officers of Ohio from enforcing the statute upon the ground it was unconstitutional. The relief sought was denied and an appeal taken to the United States Supreme Court. In that case the court held the Legislature of Ohio had the power to pass the act. Hebe Co. v. Shaw, 248 U. S. 297, 39 S. Ct. 125, 63 L. Ed. 255. This authority is the one chiefly relied upon by the government, and from this decision, together with the decisions in Hammer v. Dagenhart, supra, and Bailey v. Drexel Furniture Co., supra, it is clear that the Supreme Court recognizes a broad discretion in the states in the exercise of their legislative police powers, but denies the exercise of the same power to Congress, under the guise of regulating interstate commerce.

In the case of People v. Carolene Products Co., supra, there was a stipulation and no question of imitation or fraud involved, and the wholesomeness of Carolene was admitted. There is no stipulation to that effect in the present case, but the report of the Senate Committee which recommended that the bill be passed, expressly recognized that the article sought to be prohibited was in fact wholesome and plainly labeled, and that the fraud which it was intended to prevent was the unfair competition of local retail dealers, in misleading their customers, and the possibility that purchasers of the product in bulk might, by some exercise of chemical skill, take the filled milk out of its containers and can it, with false labels. Any frauds of this character are so remote and local in their nature, as to be beyond the power of Congress to reach. In either case the product would be innocuous until it had reached the state and become commingled with the local property.

If the act under which this prosecution is brought is valid, then we find an unfortunate situation in Illinois. The Supreme Court of Illinois holding that the manufacture of filled milk is an innocent and legitimate occupation, not adversely affecting the public health, safety, comfort, and welfare of the people; on the other hand, an act of Congress providing that the business is harmful, that the article is adulterated, injurious to the public health, and a fraud upon the public, and practically prohibiting the business and the manufacture of the product in Illinois against its will.

Is the state or the government to say which is right? Under Hebe Co. v. Shaw, supra, Hammer v. Dagenhart, supra, and Bailey v. Drexel Furniture Co., supra, the Supreme Court of the United States has said, in effect, that the state is to be the Judge.

Defendant's demurrer to the information must and will be sustained.