Poole & Creber Market Company, a Corporation, Appellant, v. J. C. Breshears, Commissioner of Agriculture, Elliott M. Dampf, Prosecuting Attorney of Cole County, and Roy McKittrick, Attorney General of the State.—125 S. W. (2d) 23.

Division Two, February 21, 1939.

*Cave & Hulen* and *George N. Murdock* for appellant.

*Roy McKittrick,* Attorney General, and *Franklin E. Reagan,* Assistant Attorney General, for respondent.

Filled milk decisions in other jurisdictions. United States. United States v. Carolene Products Co., 7 Fed. Supp. 500.

COOLEY, C.—By bill in equity in the Circuit Court of Cole County appellant, plaintiff below, sought to enjoin respondents from enforcing, as they were threatening to do, Sections 12408, 12409, 12411, 12412, 12413 and 12415, Revised Statutes 1929 (Mo. Stat. Ann., pp. 404, et seq.), relating to milk, cream, etc., on the ground that said sections of the statute are unconstitutional and void. Upon final hearing the circuit court found for the defendants, holding the statute valid, and dismissed plaintiff's bill. Plaintiff appealed.

The question presented here is whether or not said statutory provisions are valid. If they are the judgment below was right.

Said Section 12408 reads:

"Sec. 12408. *Fat or oil other than milk fat prohibited.*—It shall be unlawful for any person, firm or corporation, by himself or itself, his or its agent or servant, or as the servant or as agent of another, to manufacture, sell or exchange, or have in possession with the intent to sell or exchange, any milk, cream, emulsified cream, skim milk, buttermilk, condensed or evaporated milk, powdered milk, condensed skim milk, or any of the fluid derivitives thereof, or any of them, to which has been added any fat or oil other than milk fat, either under the name of said product or articles of (or?) the derivitives thereof, or under any fictitious or trade name whatsoever."

Section 12409 reads:

"Sec. 12409. *'Filled Milk' defined.*—The term 'filled milk' means any milk, cream or skim milk, whether or not condensed, evaporated, concentrated, powdered, dried or desiccated, to which has been added, or which has been blended or compounded with, any fat or oil other than milk fat, so that the resulting product is in imitation or semblance of milk, cream or skim milk, whether or not condensed, evaporated, concentrated, powdered, dried or desiccated, which has been melted or refined by heating, boiling or mixing. *Provided* that the above definition shall not include any distinctive proprietary food compound, not readily mistaken in tests for milk or cream, or for evaporated, condensed or powdered milk or cream: *Provided, however,* that such compound is prepared and designed for feeding infants and young children and customarily used on the order of a physician; is packed in individual cans containing not more than sixteen and one-half ounces and bearing the label in bold type, that the contents are to be used only for said purposes; is shipped in interstate or foreign commerce exclusively to physicians, wholesale or retail druggists, orphan asylums, child welfare associations, hospitals and similar institutions and generally distributed by them."

Section 12410 defines "emulsified cream." Section 12411 prohibits the use of "emulsified cream" (not here directly involved) and contains this declaration: "It is hereby declared that filled milk, and emulsified cream as herein defined, are adulterated articles of food injurious to the public health and its sale constitutes a fraud upon the public." Section 12412 provides penalties for violation of Sections 12407 to 12411, inclusive. (Sec. 12407 establishes standards for milk and is not challenged as invalid.)

Section 12413 is similar to Section 12408 except that it does not name emulsified cream. It was enacted at the same session of the General Assembly (1923) as Sections 12408 to 12412, inclusive, but in a separate bill, approved April 2, 1923, and what is now Section

12415 is the penalty section of that bill. The bill which included present Sections 12408 to 12412 was approved April 5, 1923. Those sections (12408 to 12412, inclusive) were new provisions. Present Section 12407 was a repeal of former Section 11986, Revised Statutes 1919, and the enactment of a new section in lieu thereof. In both said acts of 1923 violation was made a misdemeanor punishable by fine or jail imprisonment or both, but the extent of the permissible punishment differs. This difference in the punishment authorized will not need to be considered in this case.

Appellant is a retail dealer in groceries, meats and various articles of food, maintaining stores in several cities in Missouri. It sold, among other things, Carolene and Milnut (the products involved in this controversy), until notified by respondents that such sales were considered violative of the laws of Missouri and would be prosecuted unless discontinued, whereupon it desisted and brought this suit.

From the plaintiff's evidence (defendants introduced no evidence except certain exhibits introduced as part of the cross-examination of plaintiff's witnesses), the following facts appear:

Carolene and Milnut are identical, the only difference being in the trade name and the label. It closely resembles evaporated milk in color, taste and odor. A witness testified she could not distinguish the difference by taste or odor. It is a compound of skimmed milk and refined coconut oil. In the process of manufacture the butter fat is extracted from whole milk as completely as can be done with modern machinery, the coconut oil is added to the skimmed milk and the mixture of skimmed milk and coconut oil is concentrated to somewhat less than half its original volume. It is then packaged for shipment and sale in fourteen and a half or six ounce hermetically sealed cans, labeled "Carolene" or "Milnut," the cans used for the Missouri trade being of the same size and shape as those used in the sale of evaporated milk. An illustrative label of a Carolene can reads:

"After the can is opened, under the same conditions of temperature, CAROLENE will keep sweet longer than either fresh or evaporated canned milks.

When whipping, chill first.

### CAROLENE
Trade Mark Reg. U. S. Pat. Off.
Net Weight 14½ Ounces

'SO RICH IT WHIPS'

Not less than 18% skim milk solids
Not less than 6% nut oils
Total solids 25.5%
A compound of refined nut oils and evaporated skimmed milk

Manufactured for
CAROLENE PRODUCTS CO.
Litchfield, Ill., U. S. A.
Not to be sold for evaporated milk.

CAROLENE
A high grade wholesome food product, composed of a mixture of:
Concentrated skimmed milk and highly refined cocoanut oils. Especially prepared for use in coffee, baking and for other culinary purposes. This product complies in all respects with the Federal Food and Drugs Act of June 30, 1906, and is neither adulterated nor misbranded under the provisions thereof."

"(A list of patents under which the product is licensed is printed on label.)"

Milnut labels are the same except that the word "Milnut" is used instead of "Carolene."

Carolene and Milnut are manufactured for the Carolene Products Company, a Michigan corporation, by the Litchfield Creamery Company, of Litchfield, Illinois. The Carolene Products Company sells and distributes the product in various states. The process of manufacture is shown to be sanitary and the ingredients used, skimmed milk and refined coconut oil, are, of themselves, wholesome and of nutritive food value. It does not appear that Carolene or Milnut contains substances deleterious to health, but neither contains to any appreciable extent, the element known as Vitamin A. Coconut oil contains no Vitamin A, —nor any other vitamin. "Refined oils do not have vitamins." Butter fat is rich in Vitamin A. All or practically all of that vitamin occurring in milk is in the butter fat, so that when the butter fat is extracted by modern processes very little of that vitamin is left. Evaporated milk is about 7.8 per cent butter fat while skimmed milk contains only about 15/100 of 1 per cent. A fourteen and a half ounce can of evaporated milk contains about 1767 Vitamin A units, the same size can of Carolene or Milnut about 70 such units.

Vitamin A is the growth-promoting vitamin. It promotes growth and is a preventive of Xerophthalmia, an eye disease occurring among human beings and some of the lower animals. It tends to build resistance to the encroachment of disease "through the respiratory tract,"—"builds up the body resistance to infection through the oral cavity." It is one of the essential elements of food. Dr. Harper Zoller, a specialist in food chemistry and biology, said that it is universally recognized by doctors of infants that "evaporated milk is prescribed generally . . . for infants from two to four or five months of age as a food" and he knew of no doctor who prescribed Carolene or Milnut for babies of that age. He said that he knew of a "prepared baby food" on the market, made of vegetable oil and milk from which the butter fat has been separated, but that it sold at "quite a fancy price," practically prohibitive to poor families. We gather from his testimony that in said prepared baby food Vitamin A is supplied by some other ingredient. It is not so supplied in Carolene or Milnut, and it is clear from Dr. Zoller's testimony that if such product was used as a food for infants the necessary Vitamin A would have to be supplied from some other source. He named several articles of food in general use which contain Vitamin A, and from the evidence as a whole it may be said that in a reasonably well balanced diet, which includes other foods that supply Vitamin A, Carolene and Milnut may be safely used as a substitute for whole

milk for the purposes for which the label says it is "especially prepared," viz., "for use in coffee, baking and for other culinary uses."

Dr. Zoller told of a series of experiments he had conducted, over a period of fourteen weeks, with white rats, feeding eight on Milnut and eight on evaporated milk. At the end of the fourteen week period those fed on Milnut had grown as much as those fed on evaporated milk, looked as sleek and appeared as healthy. Dr. Zoller concluded from his experiments that Milnut and Carolene "are wholesome and healthful and nutritive food materials." He thought they could be substituted for whole milk in a "child's diet" (age not stated), "provided that the diet was a well mixed diet."

The rats chosen for the experiment were "between twenty-four and twenty-six days old" and up to that time had been fed on a diet containing ample Vitamin A, so that their systems were not depleted thereof at the beginning of the experiment. (The test was not designed as a vitamin test.) Dr. Zoller said that the white rat's habits and life cycle are similar to those of human beings; that the rat "lives about thirty times faster than the human would live"—from which, if we understand his meaning, it would seem a 24-day-old white rat would be comparable in age to a twenty-four month old child.

Carolene and Milnut are advertised and sold as "superior to evaporated milk" or milk products; as "affording everyone the luxury of whipped cream dessert,"—"costs no more and gives better results than ordinary evaporated milk"—"as far superior to ordinary evaporated milk as steel is superior to iron." It can be put on the market and sold for less than evaporated milk. Mr. Carroll, sales promotion manager of the Carolene Products Company, testified that it is being used as a substitute for genuine butter fat or whipped cream.

Appellant contends that Sections 12408, 12409, 12411, 12412, 12413 and 12415, supra, are unconstitutional and void because they deprive plaintiff of its property without due process of law in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States and of Sections 4 and 30 of Article II of the Constitution of Missouri; said Section 4, Article II declaring, *inter alia,* that all persons have a natural right to life, liberty and the enjoyment of the gains of their own industry, and said Section 30 providing, as does the Federal Constitution, that no person shall be deprived of life, liberty or property without due process of law. The further contention is made that Sections 12408, 12409, 12411 and 12412 are unconstitutional as being special legislation in violation of subsection 32 of Section 53 of Article IV of our State Constitution, which prohibits the enactment of a local or special law where a general law can be made applicable.

In our opinion the statute is not in contravention of the constitu-

tional provisions referred to. It was enacted in the exercise of the police power for the purpose, as indicated by its title, of protection of the public health and the prevention of fraud, subjects clearly within the scope of that power. Said power is not to be exercised capriciously, for the purpose of destroying or invading private rights. ''Extensive as this power is, it may be conceded that an act of the Legislature in restraint of liberty or of property, which exceeds a reasonable exercise of it, so that in fact it is not an exercise of the police power, but a capricious invasion of private right, will be held unconstitutional and void by the judicial courts.'' [State v. Addington, 12 Mo. App. 214, 219, affirmed in State v. Addington, 77 Mo. 110.] Statutes enacted under the police power for the protection of the public health or safety, for the prevention of fraud and for the public welfare must have some substantial relation to those objects. [Mugler v. Kansas, 123 U. S. 623; Addington case, supra.] But, as said in the latter case, 77 Mo. l. c. 117, ''notwithstanding this, it cannot be gainsaid that the Legislature may do many things in the legitimate exercise of that and other powers, which, however unwise or injudicious they may be, are not obnoxious to the objection of being beyond the scope of legislative authority.'' From its very nature the police power is a power to be exercised within wide limits of legislative discretion and if a statute appears to be within the apparent scope of this power the courts will not inquire into its wisdom and policy, or undertake to substitute their discretion for that of the Legislature. [Addington case, 12 Mo. App. l. c. 221; Powell v. Pennsylvania, 127 U. S. 678; Hebe Co. et al. v. Calvert et al., 246 Fed. 711, 717; Price v. Illinois, 238 U. S. 446.] In the last cited case we read (l. c. 451).

''The State has undoubted power to protect the health of its people and to impose restrictions having reasonable relation to that end. The nature and extent of restrictions of this character are matters for the legislative judgment in defining the policy of the State and the safeguards required.''

The court was there considering an Illinois statute which prohibited the sale of food preservatives containing boric acid. The court said, (l. c. 452).

''Unless this prohibition is palpably unreasonable and arbitrary we are not at liberty to say that it passes beyond the limits of the State's protective authority,'' (citing cases); and further,

''The contention of the plaintiff in error could be granted only if it appeared that by a consensus of opinion the preservative was unquestionably harmless with respect to its contemplated uses, that is, that it indubitably must be classed as a wholesome article of commerce so innocuous in its designed use and so unrelated in any way to any possible danger to the public health that the enactment must

be considered as a merely arbitrary interference with the property and liberty of the citizen. It is plainly not enough that the subject should be regarded as debatable. If it be debatable, the Legislature is entitled to its own judgment, and that judgment is not to be superseded by the verdict of a jury upon the issue which the Legislature has decided.''

In Powell v. Pennsylvania, supra, the court had under consideration a state statute relating to the manufacture and sale of oleomargarine. The validity of the statute was upheld. The court said, 127 U. S. 1. c. 684, quoting from Sinking Fund Cases; 99 U. S. 700, 718, ''Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule.'' The same rule as to presumption of validity of a statute and that the burden of showing beyond reasonable doubt that it is invalid rests upon him who so asserts prevails in this State. State v. Layton, 160 Mo. 474, 61 S. W. 171, holding valid a statute forbidding the use of alum in baking powders; City of St. Louis v. Liessing, 190 Mo. 464, 89 S. W. 611, sustaining as constitutional an ordinance of the City of St. Louis prescribing the standard for milk offered for sale; State ex rel. Rodes v. Warner, 197 Mo. 650, 656, 94 S. W. 962; State ex rel. Meals v. Hackmann (Mo.), 217 S. W. 271; State v. Shelby, 333 Mo. 1036, 1043, 64 S. W. (2d) 269, 271.

It may be said that no laws more closely touch the public welfare than those relating to food and health. Milk is an article of food almost universally used by the people. It is especially important as a food for infants and growing children. Whole milk and evaporated milk contain the butter fat which is rich in the growth promoting Vitamin A. Carolene and Milnut are almost wholly lacking in that essential element. Concede that they contain no ingredients which, of themselves, are deleterious to health. That alone is not sufficient to brand as invalid a statute prohibiting their sale for general consumption as a substitute for milk. [See Addington case, supra, 12 Mo. App. 1. c. 222.] Those products *are lacking* in an element, essential to growth and health, contained in the genuine article. By their close resemblance to evaporated milk they readily lend themselves to imposition and fraud. Grant also that they are truthfully labeled and that the manufacturer did not intend that they should be sold as evaporated milk. Many consumers, doubtless, do not see the labels, many others probably do not read or understand them. [See Hebe Co. v. Shaw, 248 U. S. 297.] The product is advertised and sold as ''superior to evaporated milk,'' ''costs no more and gives better results than ordinary evaporated milk,'' etc. It is

cheaper than evaporated milk and if sold at the same or a slightly lower price a greater profit can be made by retailers. In considering the question of prevention of fraud the temptation and opportunity to persons dealing in the product to make greater profits and the proneness of many to yield to such temptation may have been in the legislative mind. And in Hebe Co. v. Calvert, supra, 246 Fed. l. c. 719, the court says,

"In Dent v. West Virginia, 129 U. S. 114, 122, 9 Sup. Ct. 231, 32 L. Ed. 623, it was announced that the power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity, as well as deception and fraud."

In State v. Bockstruck, 136 Mo. 335, 357, 38 S. W. 317, we read:

"The great preponderance of authority sustains the view announced in *Addington's* case, the theory of which was the right of the State in the exercise of its police power to forbid the manufacture or sale of articles which could readily be used for the purposes of deception, although not perhaps designed originally for that purpose."

In Hebe Co. v. Calvert, supra, a three judge Federal court held constitutional an Ohio Statute under which the manufacture and sale of a product called Hebe was prohibited. Hebe, like Carolene and Milnut, was a compound of condensed (held to be synonymous with "evaporated") skimmed milk and refined coconut oil, in about the same proportions as in Carolene and Milnut. Hebe was truthfully labeled "A compound of evaporated skimmed milk and vegetable fat" and the label stated "For coffee and cereals, for baking and cooking," and the label complied with the National Food and Drugs Act. The Ohio act was assailed as unconstitutional on grounds similar to those advanced in the case before us. We think the reasoning of Hebe Co. v. Calvert sustains the validity of the Missouri statute. On the same facts as in the Calvert case the United States Supreme Court held the Ohio statute valid in Hebe Co. v. Shaw, supra.

March 4, 1923, the United States Congress passed a Filled Milk Act making it unlawful to manufacture filled milk "within any Territory or possession, or within the District of Columbia" or to ship it or deliver it for shipment in interstate or foreign commerce. Section 61 of the act (Title 21, U. S. C. A., Chap. 3), defines filled milk in substance the same and in almost identical language, as our Section 12409, supra. Section 62 of said Act declares, as does our Section 12411, that filled milk as defined in the Act "is an adulterated article of food, injurious to the public health, and its sale constitutes a fraud upon the public." The validity of that Act was called in question in United States v. Carolene Products Company, 304 U. S. 144, 82 L. Ed. 1234, 58 Sup. Ct. 778, decided by the United States

Supreme Court April 25, 1938. The defendant, appellee therein, had been indicted for violation of said Filled Milk Act. The trial court had sustained a demurrer to the indictment on the authority of an earlier case, United States v. Carolene Products Co., 7 Fed. Supp. 500 (cited by appellant here), which held the Act invalid. The Court of Appeals for the Seventh Circuit had sustained it in Carolene Products Co. v. Evaporated Milk Assn., 93 Fed. (2d) 202. In the case in the Supreme Court the product charged by the indictment to have been illegally transported was Milnut, the same product, under a different trade name, as Carolene. In the Supreme Court it was urged that the Act was invalid because, *inter alia*, it denied the appellee the equal protection of the laws and also deprived it of its property without due process of law, particularly in that said Act ''purports to make binding and conclusive upon appellee the legislative declaration that appellee's product 'is an adulterated article of food injurious to the public health and its sale constitutes a fraud on the public,' ''—contentions urged in the instant case. The appellee's contentions were denied and the Act was held valid. The case is so directly in point that we feel justified in quoting from the Supreme Court's opinion at some length. The court said:

''The prohibition of shipment of appellee's product in interstate commerce does not infringe the Fifth Amendment. Twenty years ago this Court, in Hebe Co. v. Shaw, 248 U. S. 297, held that a State law which forbids the manufacture and sale of a product assumed to be wholesome and nutritive, made of condensed skimmed milk, compounded with coconut oil, is not forbidden by the Fourteenth Amendment. The power of the Legislature to secure a minimum of particular nutritive elements in a widely used article of food and to protect the public from fraudulent substitutions, was not doubted; and the Court thought that there was ample scope for the legislative judgment that prohibition of the offending article was an appropriate means of preventing injury to the public.

''We see no persuasive reason for departing from that ruling here, where the Fifth Amendment is concerned; and since none is suggested, we might rest decision wholly on the presumption of constitutionality. But affirmative evidence also sustains the statute. In twenty years evidence has steadily accumulated of the danger to the public health from the general consumption of foods which have been stripped of elements essential to the maintenance of health. The Filled Milk Act was adopted by Congress after committee hearings, in the course of which eminent scientists and health experts testified. An extensive investigation was made of the commerce in milk compounds in which vegetable oils have been substituted for natural milk fat, and of the effect upon the public health of the use of such compounds as a food substitute for milk. The conclusions drawn from

evidence presented at the hearings were embodied in reports of the House Committee on Agriculture, H. R. No. 365, 67th Cong., 1st Sess., and the Senate Committee on Agriculture and Forestry, Sen. Rep. 987, 67th Cong., 4th Sess. Both committees concluded, as the statute itself declares, that the use of filled milk as a substitute for pure milk is generally injurious to health and facilitates fraud on the public.

"There is nothing in the Constitution which compels a Legislature, either national or State, to ignore such evidence, nor need it disregard the other evidence which amply supports the conclusions of the Congressional committees that the danger is greatly enhanced where an inferior product, like appellee's, is indistinguishable from a valuable food of almost universal use, thus making fraudulent distribution easy and protection of the consumer difficult."

Appended as a footnote to the opinion at this point is a reference to the now "extensive literature indicating wide recognition by scientists and dietitians of the great importance to the public health of butter fat and whole milk as the prime source of vitamins, which are essential growth producing and disease preventing elements in the diet," and the further statement that "When the Filled Milk Act was passed, eleven states had rigidly controlled the exploitation of filled milk, or forbidden it altogether. [H. R. 365, 67th Cong., 1st Sess.] Some thirty-five states have now adopted laws which in terms, or by their operation, prohibit the sale of filled milk." Then follows list of said states, with references to their respective statutes.

■ The court further held that whether the public would be adequately protected by the prohibition of false labels and false branding imposed by the Pure Food and Drugs Act or whether it was necessary to go farther and prohibit a substitute food product thought to be injurious to health if used as a substitute when the two are not distinguishable, was a matter for the legislative judgment and not for the court; that it was no valid objection to the statute that its prohibition was not extended to oleomargarine or other butter substitutes in which vegetable fats or oils are substituted for butter fat; that the Fourteenth Amendment, "applicable only to the states, does not compel their Legislatures to prohibit all like evils, or none. A Legislature may hit at an abuse which it has found, even though it has failed to strike at another." (Citing cases.)

■ It is argued by appellant that the Legislature in enacting the sections of the statutes in question exceeded its constitutional power in that said sections "are not a proper exercise of the police power, having no relation to the preservation of the health, morals, safety or welfare of the public." The police power, as we have said, is to be exercised within wide limits of legislative discretion. It has been said to be the most essential of powers, at times the most insistent,

and always one of the least limitable of the powers of government. The statute in question is referable to that power and it will be presumed to be valid unless invalidity is clearly made to appear, as we have shown. It is assailed as having no relation to the public health or to the prevention of fraud and deceit. Primarily the determination of whether or not the public health may be injuriously affected or whether the public may be defrauded or deceived by the manufacture and sale of an article is for the Legislature. It is the duty of the court to sustain the law unless it clearly appears to be arbitrary and unreasonable or passed for some ulterior purpose and not in the interest of the general welfare, or to have no relation in fact to the purported legislative purpose. These propositions are well established. If the situation is such that a fairly debatable question is presented, then it is for the Legislature to determine, and the court should not interfere, even if, in its opinion, the conclusion of the Legislature is an erroneous one. [Hebe Co. v. Shaw, supra; Price v. Illinois, supra; Hebe Co. v. Calvert, supra; Armour & Co. v. North Dakota, 240 U. S. 510, 513; State v. Layton, supra, 160 Mo. l. c. 498, 61 S. W. 171; State ex rel. Carnation Milk Products Co. v. Emery, 178 Wis. 147, 189 N. W. 564.]

The Supreme Court, in United States v. Carolene Products Co., supra, and, with more detail, the Circuit Court of Appeals, in Carolene Products Co. v. Evaporated Milk Assn., supra, pointed out that the Congress, when considering the Filled Milk Act, had before it extensive and reliable information supporting the wisdom of the proposed legislation. Our State statute was enacted about a month after the passage by Congress of the Filled Milk Act. Our Legislature may have had the benefit of the same or similar information. We are not advised by the record before us what investigation was made by the Legislature but we must presume that it made proper investigation to determine the facts. This presumption is one we are bound to indulge, in deference to a co-ordinate branch of the State government. [State ex rel. Meals v. Hackmann, supra; Powell v. Pennsylvania, supra, 127 U. S. 1. c. 686.] If there is any reasonable basis upon which the legislation may constitutionally rest the court must assume that the Legislature had such fact in mind and passed the act pursuant thereto. All facts necessary to sustain the act must be taken as conclusively found by the Legislature, if any such facts may be reasonably conceived in the mind of the court. [6 R. C. L., pp. 102-116, secs. 101-116; State ex rel. Carnation M. P. Co. v. Emery, supra.] "Nor do the courts have to be sure of the precise reasons for the legislation or certainly know them or be convinced of the wisdom or adequacy of the laws." [Armour & Co. v. North Dakota, supra.]

Statutes similar to ours have been held constitutional in: United

States v. Carolene Products Co. (U. S.), supra; Carolene Products Co. v. Evaporated Milk Assn. (C. C. A.), supra; State ex rel. Carnation Milk Prod. Co. v. Emery (Wis.), supra; Hebe Co. v. Calvert (D. C.), supra; Hebe Co. v. Shaw (U. S.), supra; Carolene Products Co. v. Harter, Penn. Ct. of Com. Pleas, March, 1937, affirmed 329 Pa. 49, February 1, 1938. Similar Statutes were held unconsitutional and void in: Carolene Products Co. v. Thomson, 276 Mich. 172, 267 N. W. 608; Carolene Products Co. v. Banning, 131 Neb. 429, 268 N. W. 313; Carolene Products Co. v. McLaughlin, 365 Ill. 62, 5 N. E. (2d) 447; and People v. Carolene Products Co., 345 Ill. 166, 177 N. E. 698.

It will be seen that filled milk or compounds such as these, so closely resembling evaporated milk as to be readily mistaken and substituted for milk containing the butter fat, have been considered inimical to the public welfare by a large portion of the people of this country. Some thirty-five states have passed laws prohibiting or rigidly controlling the sale thereof. It would seem there must have been some reasonable basis to induce legislation of this kind by so many different bodies. "Certainly on the question of whether it is a debatable subject it is pertinent to know that the matter has been generally debated." [State ex rel. Carnation Milk Prod. Co. v. Emery, supra, quoted in Carolene Products Co. v. Evaporated Milk Assn., supra.] It appears to us clear that, to say the least, the question is debatable, and if so the legislative judgment must prevail.

It is asserted that the statute in question is a special law, violative of the State Constitution, being "an arbitrary and unreasonable classification depriving appellant of equal protection under the law." It is argued that both skimmed milk and coconut oil are *individually* legitimate articles of food under Missouri law; that therefore the product here involved is a compound of recognized healthful foods; and that the public health is amply protected "by the general food laws of the state, the laws which govern the production and sale of all foods;" wherefore the law in question is a "special law directed at a certain, particular food compound." We know of no "general food law" which "governs the production and sale of all foods" unless counsel means the whole body of the law relating to foods, and if such be counsel's meaning it is idle to contend that the Legislature may not legitimately make different regulations and provisions, applying to different kinds of food products. For example we now have laws permitting and regulating the manufacture and sale of oleomargarine. It will hardly be contended that oleomargarine may not legitimately be placed in a different classification than milk for legislative purposes. That the Legislature may make reasonable classification among the various subjects of legislation must be conceded, and since the presumptions are all in favor of the va-

lidity of its acts "it must be made to appear beyond a reasonable doubt that 'there are no distinctive circumstances' justifying the classification." [Thomas v. Buchanan County, 330 Mo. 627, 51 S. W. (2d) 95.] It does not so appear in the instant case. Appellant's argument overlooks the fact that the product in question lacks an essential food element contained in evaporated milk, is easily mistaken for the latter and may easily be made the vehicle of imposition and fraud. Milk is almost universally used as a food and upon it the health of the people largely depends. It has often been particularly the subject of regulatory legislation. In City of St. Louis v. Liessing, supra, in upholding the validity of an ordinance of St. Louis prohibiting the sale of milk containing less than a certain amount of milk fats, the court said, 190 Mo. l. c. 481, "Perhaps on no one subject has this police power been affirmed as often as the right to inspect and regulate the sale of milk and cream." Appellant's contention that the law in question violates the constitutional inhibition against special laws cannot be sustained.

■ It is further contended that the law in question establishes a "conclusive presumption as to fraud and adulteration," thus depriving appellant of its constitutional rights to due process of law. A similar contention in United States v. Carolene Products Co., supra, was denied, the court saying, "There is no need to consider it here as more than a declaration of the legislative findings deemed to support and justify the action taken as a constitutional exertion of the legislative power, aiding informed judicial review, as do the reports of legislative committees, by revealing the rationale of the legislation."

In State v. Bockstruck, supra, the statute in controversy contained a provision that any person having possession or control of imitation butter, etc., contrary to the provisions of the statute "shall be construed to have possession of property with intent to use it as a means of committing a public offense." The court said, 136 Mo. l. c. 355, that if the act made something *conclusive evidence* of guilt, as counsel claimed, it would be unconstitutional (and on this point see also State v. Shelby, supra), but "We regard the words of Section 8, '*shall be construed*,' etc., as simply meaning that such acts as are therein mentioned, shall be deemed prima facie evidence of possession, etc."

It may be conceded that if, as appellant argues, the statutory declaration that filled milk is an adulterated article of food injurious to the public health and its sale constitutes a fraud upon the public be construed to establish a conclusive presumption of guilt, binding upon the court and conclusive against the defendant, that portion of the statute could not be upheld. But we do not so construe the statute. We attribute to it only the effect given by the court in United

States v. Carolene Products Co., supra, to a similar declaration in the Act of Congress there under review. As such declaration it is entitled to respect but is not to be held conclusive by the courts. It was not treated by the court below as conclusive in the instant case.

In Hall v. City of Sedalia, 232 Mo. 344, 134 S. W. 650, an amendment, passed in 1909, to an earlier act of 1895 authorizing a sewer system, provided for extensions by adding disposal plants. A dispute arose over a contract based upon a city ordinance authorizing the extension. The court held that the original act (of 1895) was broad enough to authorize the extension and, speaking of the amendment, said, 232 Mo. l. c. 355:

"The amendment of 1909, with its emergency clause, may be regarded as a legislative declaration that the original act was not broad enough to include disposal plants, and as such it is entitled to respectful consideration. We do not find that this amendment was occasioned by any ruling of this court holding the original act insufficient. The amendment was made, perhaps, to settle any question of doubt. However that may be, we are not bound by an erroneous construction of the law by the Legislature. [State ex inf. v. Goffee, 192 Mo. l. c. 688.] If, as a matter of law, the Act of 1895 authorized the construction of the plant in question, the fact that the Legislature erroneously regarded the act as insufficient, or doubtful, would not make it so."

Moreover, even if the legislative declaration above quoted should be held void, as unconstitutional, it would not affect the validity of the remainder of the statute. It is well settled that a statute may be sustained as constitutional in part though void in other parts, unless its provisions are so connected and interdependent that it cannot be presumed the Legislature would have enacted one without the other. "The test . . . is whether or not, . . . after separating that which is invalid, a law in all respects complete and susceptible of constitutional enforcement is left, which the Legislature would have enacted if it had known that the exscinded portions were invalid." [State ex rel. Audrain County v. Hackmann, 275 Mo. 534, 205 S. W. 12.] The rule is thus succinctly stated in State ex inf. Hadley v. Washburn, 167 Mo. 680, 697, 67 S. W. 592; "Where the part of an act that is unconstitutional does not enter into the life of the act itself, and is not essential to its being, it may be disregarded and the rest remain in force." That is the case before us. The declaration complained of may be eliminated and a law remains as complete and workable in every respect as it is with that declaration and which would as fully express and effectuate the obvious legislative purpose.

We hold the statutes in question to be constitutional and valid. The

judgment of the circuit court is affirmed. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.