9 N.J. Super. 442 (1950)
74 A.2d 630
THE CITY OF NEWARK,
v.
CHARLES REALTY COMPANY, DEFENDANT.
Superior Court of New Jersey, Essex County Court Law Division.
Decided June 27, 1950.
*446 Mr. Charles Handler, Mr. Louis Weiss, of counsel, for complainant-appellee.
Mr. John J. Clancy, by Mr. Joseph A. Hayden, for defendant-appellant.
Mr. John Cervase for the Newark Citizens Housing Committee, amicus curiae.
HARTSHORNE, J.C.C.
These three appeals, consolidated for trial, are test cases to question the constitutionality of the municipal ordinances, the basis of the many penal proceedings recently instituted by the City of Newark, as one branch of its so-called slum clearance program. The technique of this branch of the program apparently is to compel the owners of individual properties to maintain such properties in good condition, the other branch being the creation of the well-known slum clearance projects. The defendant in these test cases was convicted of violating the ordinances in question by failing to maintain its premises in the required condition. On the present appeals, the Newark Citizens Housing Committee has been permitted to intervene as amicus curiae.
Defendant owner attacks its convictions in the court below not only on certain general grounds applicable to all three cases, but also on certain special grounds applicable to such cases separately. We turn initially to these joint grounds of attack.

THE ORDINANCES AS AN EXERCISE OF THE POLICE POWER.
Defendant's main contention originally was that the ordinances are unconstitutional, in that they do not protect the health and welfare of the public; thus are not a proper exercise *447 of the state police power, delegated for enforcement to the City of Newark; and, therefore, in their limitation of the defendant's property rights, constitute a taking of property without due process of law, contrary to the provisions of both the State and Federal Constitutions. (N.J. Const., Art. I, par. 20; U.S. Const. Amend XIV.) In support of these arguments, defendant calls attention to the well-settled principle of the common law that a landlord is under no duty to make repairs to leased premises unless he has contracted to do so, or the defective condition exists in a portion of the premises used in common by all tenants, there being no such promise, nor common use, here. Clyne v. Helmes, 61 N.J.L. 358 (Sup. Ct. 1898); Ross v. Tetradis, 7 N.J. Super. 224 (App. Div. 1950).
But, it has for centuries been of the essence of civilized society, where many individuals live as neighbors, that each must exercise his rights with due regard to the rights of all  sic utere tuo ut alienum non laedas. Under such circumstances, this limitation of the rights of one, if necessary to protect the rights of all, is not a taking of property without due process of law, but, on the contrary, if properly carried out, is the use of due process of law for the protection of the rights of all. Mansfield & Swett, Inc., v. Town of West Orange, 120 N.J.L. 145 (Sup. Ct. 1938); Annett v. Salsberg, 135 N.J.L. 122 (Sup. Ct. 1947); Kugler v. State of Kansas, 123 U.S. 623 (Sup. St. 1887); Hudson County Water Co. v. McCarter, 209 U.S. 349 (Sup. Ct. 1908). The justification of this limitation of the rights of an individual thus lies in the need for the protection of the rights of others; these rights here being claimed to be the public health and welfare. The defendant hence contends that the ordinances in question, as sought to be enforced against it, do not tend directly and substantially to protect the health and welfare of the public. We turn accordingly to the consideration of the effect, if any, on the public health and welfare of the ordinances in question, and the complaints thereunder, on which the convictions resulted.

*448 CASE I.
The complaint therein charges a violation of the provisions of Section 1039, par. 3 of the city ordinances, as amended and supplemented, in that defendant, being the owner of 22 Hillside Place, Newark, did "fail to keep at all times in good workable condition, free from leaks and defects the hot water boiler on the 2nd floor (Paterson) apartment and the kitchen hot water tank on the 3rd floor (Caskins) apartment," to this complaint being attached a previous notice served on defendant.
The pertinent portion of the ordinance in question provides that "the owner shall maintain in good workable condition, free from leaks or any other defects, the hot water storage tank, hot water pipes and the hot water apparatus."[1] The stipulated facts show that such hot water equipment was entirely within the possession and control of the respective tenants, that the defendant owner was not obligated by the rental to furnish hot water to them, nor to make repairs to them. Further, that while such fixtures were in useable condition at the time of the renting, and were used for that purpose by the tenant, they thereafter, during such tenancy, "became and remained unuseable." For the violation a penalty of $5 was imposed.

*449 CASE II.
The complaint therein charges the violation of Section 982 of the Newark ordinances, as amended, in that defendant, being the owner of 218 Charlton Street, Newark, did fail to paint two rooms, after having been notified to do so by the Health Officer.
The pertinent portion of the ordinance in question provides that "The owner, agent, lessee or occupant of any dwelling or factory building or part thereof shall thoroughly cleanse all the rooms as often as shall be required by said Board or its officers, and shall when notified so to do, well and sufficiently whitewash or paint the walls and ceilings thereof."[2] The proof showed a violation of this ordinance in fact, for the violation of which a fine of $10 was imposed.

CASE III.
The complaint therein charges that defendant, being the owner of 172 Prince Street, Newark, violated the provisions of Section 1069 of the Newark ordinances, as amended, in that it did maintain a nuisance at that address by failing to repair defective plaster in several apartments, and by failing to repair a defective kitchen stove in one, "said condition being dangerous to human life and health." The pertinent portion of the ordinance in question provides that "Whatever *450 is dangerous to human life or health * * * is hereby declared to be a nuisance. Any person * * * who shall continue to retain or maintain any of them shall on conviction thereof forfeit and pay a penalty * * *."[3] For the violation thereof a fine of $25 was imposed.
In substance the first objection leveled by defendant owner jointly against his three convictions, and the municipal ordinances on which they are based, is that his failure to maintain in good workable condition for the use of his tenants hot water storage tanks in their premises, his failure to paint the walls and ceilings of certain of their premises, when notified so to do by the Health Department, and his failure to repair defective plaster and a defective stove in certain premises, did not, nor did any of them, tend directly and substantially to endanger the public health and welfare. However, while defendant vigorously cross-examined the city's witnesses in that regard, it did not, except for the stipulated facts in Case I, as above, offer one word of evidence in support of such contention.
On the other hand, the evidence produced by the city substantially showed the following, through the testimony of doctors, public health officials, trained inspectors, and the stipulations of two recent statistical reports of the Housing Authority of the City of Newark:
That the three properties, where the alleged violations occurred, were all in Newark's Third Ward "the greatest slum area in the City of Newark, showing both high morbidity and mortality rates, exceeding any other ward in the City of Newark." Those Third Ward rates have "always been extremely *451 high. In the last year we found more cases of tuberculosis in the Third Ward than any other ward. * * * three or four times as many as most of the wards * * *. The tuberculosis condition in the Third Ward unfortunately is one of the highest, not only in the State of New Jersey  it is the highest in the State of New Jersey  but one of the highest in the United States * * * There is a direct relation between slums and tuberculosis, not only in that ward, but anywhere in the United States. We know where slums exist there are the associated factors of poor hygiene, poor sanitation, poor ventilation, overcrowding, and they form the basic network for the spread of tuberculosis." In addition to the fact that tuberculosis in slum areas is "significantly higher than in the non-slum areas," so are "venereal disease * * * gastro intestinal diseases, diseases of the respiratory system, skin diseases." These are all "communicable diseases." That is, they are "spread either directly or indirectly through a vector of some kind," such as "lice, roaches, rats, mice, mosquitos, flies." Furthermore, the very conditions of lack of hot water fixtures, lack of paint, defective plaster, and defective stoves "in a slum area are more likely to produce the presence of (such) vectors than in an area not a slum area," and thus transmit such communicable diseases to the rest of the public, as well as more likely to harbor and maintain the germs of such diseases "than in an area not a slum area." At the Belmont site, stipulated in evidence as being that of a slum area immediately adjacent, and similar, to the Third Ward, "the percentage of homes needing major repairs was about 70% in 1940." This shows the reason for the host of prosecutions by the city under the ordinances in question, and points to the substantial effect which this prohibited deterioration and dilapidation of properties has on the public health and welfare.
More specifically, as to the lack of hot water storage equipment alone, the proof shows that the failure to have hot water readily available in sufficient quantities, which such equipment alone makes possible, "will definitely increase the danger of *452 the production of disease" and "the spread of disease." For instance, as to gastro-intestinal diseases, there have been "outbreaks of that disease because hot water was not available for that purpose," the testimony instancing as typical, the spread of such disease throughout the city from a restaurant, an employee of which fails to properly wash his hands due to the lack of hot water at home, and thus spreads this diarrheal disease. The need of hot water was also testified to "in order to properly cleanse a home and to prevent the spread of disease either on walls or floors by cleaning up the germs." Ample "hot water is the only sure way of cleaning up and preventing germs from multiplying."
Turning to the failure to paint, it should be noted that the cases in question involved not mere esthetics, but the owner's failure, after notice, to paint over walls which were porous, and which, therefore, became the nesting place of lice and other "vectors" of disease, as above referred to. Obviously, the retention of these nesting places of these transmitters of disease throughout the entire area directly tended to endanger the public health.[4]
As to the effect on the public health of defective plaster, the evidence, including photographs, showed several instances where the plastering had become so defective that the lath, and dark and vacant wall spaces underneath it, opened into the rooms. This again formed "the opportunity of nesting for vectors of disease," with the consequent effect upon the spread of disease throughout the community, endangering the public health, "because of the vectors which travel from *453 house to house, and have been known to travel from block to block." As to the defective stove, the subject of the same complaint as the defective plaster, it was proven that the crack in the firebox directly affected public health, due to the escape of both coal gas and dust from the ashes. While these ashes are not immediately dangerous to health, as the coal gas is, nevertheless "the accumulation of such ashes and dust does become a hazard and a danger to health." This is because when these accumulate, they in turn harbor disease bacteria, which thus either continue alive, if not to multiply, to the danger of the public.
Finally, as to the general effect of the above dilapidated conditions in defendant's premises, and throughout that general area, on the public health and welfare, the stipulated studies of the City of Newark Housing Authority are enlightening. While these studies frankly admit that the differences found between the conditions in the population groups in slum areas and those in rehoused areas cannot be attributed entirely to the difference in the housing condition, these studies conclude, not only because housing is the outstanding difference between these groups, but because approximately the same differences have been found to exist between groups similarly situated in many other cities than Newark, that the difference between good and bad housing is at least an important factor in producing the following:
As to tuberculosis, twice as many persons contracted this disease in the slum areas as in the housing projects. As to communicable diseases generally, their rate was always higher in slum areas than in the projects. As to juvenile delinquency, with the exception of a single project, which had inadequate recreation and other facilities, the rate was substantially higher in the slum areas than in the housing projects. Not only does this last difference appear in Newark, but studies in Philadelphia, Cleveland, Birmingham, Richmond, Denver, Seattle, Hartford, and Chicago, all indicate essentially the same difference in the juvenile delinquency rate, which in the slum areas is roughly double that in the cities generally. As *454 to fires per 10,000 persons, there were more than thrice as many in the slum areas as in the housing projects.
Leaving entirely out of account the losses in life and property due to fire, and considering only the cost to the municipality as a whole, of responding to fires by the Fire Department, if the fire rate in the slum areas had been the same as it was in the housing projects, the City of Newark would have been saved in the single year 1942 a half million dollars. What is true of the Fire Department, is obviously true equally of the Police Department, i.e., that the doubled juvenile delinquency rate in the slum areas costs the city double the amount in police protection, including doubling the cost of our courts, our probation system, our custodial institutions. What applies to the Fire and Police Departments, must needs apply as well to the Health Department. Thus, with the increased disease rate, as above set forth, these slum areas have cost the city as a whole tremendous sums of money in the maintenance of hospitals, out-patient clinics, public health inspection, etc., a large proportion of which would be unnecessary had not the buildings in this slum area been permitted to deteriorate into slum conditions. Further the official 1946 report of the Newark Housing Authority shows that each slum area dwelling costs the city $380 a year more than the city receives therefrom in taxes. In other words, the failure of the property owners, and of the tenants also, to an appropriate extent, to maintain their premises in good tenantable condition, costs the citizens of Newark annually fourteen million dollars  almost one-third of the city's total 1942 budget. Of course, these moneys come in the end, not only out of the pockets of the property owners, but out of the pockets of every member of the public who is a tenant, or who wears clothes and buys food, i.e., from every citizen. For the cost of his clothes and food must in the end meet these added taxes. Thus, in dollars and cents the failure of defendant to maintain its properties in proper condition has substantially affected the public welfare, as well as the public health.
*455 But, of course, this dollar effect on the public welfare is by no means as important as is the effect on the lives of those in that area, and indeed in the city at large, as indicated both by the juvenile delinquency situation, and the public health situation, above indicated. Small wonder that defendant failed to produce any evidence to controvert the above evidence produced by the City of Newark, to indicate that the public health ordinances in question were a valid attempt to exercise the delegated police power of the State. Parenthetically, it perhaps should be stated that the court cannot consider the policy of enforcing on property owners these hitherto unusual expenditures for repairs, at the same time that the property owners have been prevented by rent control from meeting these increased costs from increased rentals, and this without regard to the decreased purchasing power of the dollar. For the inquiry of the court is strictly delimited to the question of the power of the municipality to enforce these ordinances, not to their policy.
Nor is the common law as archaic as defendant's above reliance thereon would indicate. For the common law has already clearly recognized the fact, in a situation analogous to that of landlord and tenant, here involved, that the duty of a property owner to an individual, regarding his property, may well differ from his duty in that regard to a municipality. Thus, if a property owner has properly constructed a sidewalk, while he has no duty, so far as an individual is concerned, to maintain it against the results of natural wear and tear, nevertheless, a municipality may compel him to maintain it in proper condition, despite natural wear and tear. Fielders v. North Jersey St. Ry. Co., 68 N.J.L. 343, 352 (E. & A. 1902); Sewall v. Fox, 98 N.J.L. 819, 822 (E. & A. 1923). This is substantially what the City of Newark contends defendant must do in the present cases.
Furthermore, defendant concedes that it is proper to expend the public's money by the millions, or perhaps billions, to wipe out slum areas, and create up-to-date housing projects, as an exercise of the sovereign power. If so, how can it be *456 claimed that it is not an equally proper exercise of the sovereign power, to prevent properties from becoming a slum area, through compelling those having property rights therein to maintain them in proper condition? The latter is slum prevention, the former is slum cure. Both are directed to the same end of preserving the public health and welfare.

OTHER OBJECTIONS TO THE ORDINANCES.
Having thus ascertained that the main objection raised by defendant to the validity of all three ordinances is without substance, we turn to the second general objection. This is that such ordinances are arbitrarily discriminatory, in that they single out landlords alone to be penalized. But this would seem incorrect, both in fact and in law.
As to the above ordinance concerning painting and cleansing in Case II, this expressly applies to the owner, agent, lessee or occupant, and as to "any dwelling or factory building." It thus covers all the citizens of Newark, and the great bulk of the buildings therein. The fact that it leaves out a few buildings, such as restaurants and theaters can hardly make it arbitrary. Like any other human contrivance, the ordinance cannot be expected to be absolutely perfect. The common law, itself being a human contrivance, does not so require. Amodio v. West New York, 133 N.J.L. 220 (Sup. Ct. 1945); Patsone v. Com. of Pennsylvania, 232 U.S. 138 (Sup. Ct. 1914); West Coast Hotel Co. v. Parrish, 300 U.S. 379 (Sup. Ct. 1937). Nor, because of the generality of its language, is the ordinance involved in Case III subject to such objection. As to the hot water supply, and hot water fixture ordinance involved in Case I, the ordinance provides that it shall be applicable "in all buildings" where such apparatus exists, thus making it enforceable against all who control such apparatus, be it landlord or tenant. In addition, it provides that where the hot water itself is heated by "the lessee, sub-lessee, or other person, the owner shall maintain" such apparatus. In other words, the ordinance operates without discrimination *457 as between landlord and tenant in general, save in cases where the owner might contend that the circumstances relieved him from all responsibility, in which cases it covers the owner explicitly. And even where the ordinance places the obligation solely on the owner, it would not seem invalid as discriminatory for the reasons stated above. Patsone v. Com. of Pennsylvania, supra.
Defendant's final attack on the validity of these ordinances jointly is that the City of Newark lacks any statutory authority to adopt them. However, a reference not only to the provisions of the municipal charter, but to the so-called Home Rule Act, and other statutory enactments would clearly lead to a contrary conclusion.[5]
These are all in addition to the provisions of the State Sanitary Code to the same general effect, under which, however, the present proceedings apparently were not instituted. But the law is settled that the provisions of the State Sanitary *458 Code do not "limit the right of any local Board of Health to adopt such ordinances, rules and regulations as in its opinion may be necessary * * *." (R.S. 26:1A-9; Board of Health of Weehawken Tp. v. N.Y. Central R. Co., 4 N.J. 293 (Sup. Ct. 1950). Of course, the mere fact that a municipality has the additional power to abate and remove nuisances generally (R.S. 40:48-2.3 et seq.) cannot "abrogate or impair the powers of the courts or of any department of any municipality to enforce any provisions of its charter or its ordinances or regulations, nor to prevent or punish violations thereof." (R.S. 40:48-2.11.)
Particularly is this the case in view of the provisions of the new State Constitution. "The provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be liberally construed in their favor. The powers of counties and such municipal corporations shall include not only those granted in express terms but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law." (Art. IV, Sec. VII, par. 11.) These provisions, expressly applicable to the statutes and ordinances here involved, clearly control all law, state and municipal, from the time of the adoption of this basic and organic *459 public policy of the State of New Jersey. The general provisions in the "Schedule" of the Constitution continuing the previous law in effect must, of course, yield to the above-quoted provisions expressly applicable thereto. Ackley v. Norcross, 122 N.J.L. 569 (Sup. Ct. 1939); affirmed, 124 N.J.L. 133 (E. & A. 1939). To that extent, the strict construction of municipal ordinances alluded to in N.J. Good Humor v. Bradley Beach, 124 N.J.L. 162 (E. & A. 1939), are no longer applicable since that case was decided previous to the adoption of the 1947 Constitution.
Defendant's attacks on the three ordinances jointly having been shown to lack substance, we turn accordingly to the defendant's attack on the ordinances individually.
1. Defendant attacks the complaint in Case I on the ground that it is inapplicable to defendant in fact, on the theory that no one is covered by the ordinance (Sec. 1039) save those covered by its first paragraph, i.e., persons "obligated by rental, lease or contract to furnish a supply of hot water." It is stipulated that defendant is not so obligated.
But any such construction would render this ordinance of minimal value in preserving public health. For then it would not apply to the great multitude of cases where, as here, the hot water tanks are not supplied with hot water from a central system under the landlord's control, but exist, and are heated, entirely in the tenant's own apartment. These multitudinous situations are covered by the remaining paragraphs of the ordinance. In order to effectuate the purpose of the ordinance, these paragraphs should thus be read as they are written, separated from the first paragraph.
Nor is there substance to defendant's allusion to the fact that a small proportion of tenants in the Third Ward have no hot water supply at all. That is a regrettable fact, but it has no bearing on the enforcement of the ordinance as to those who are furnished with hot water storage tanks by their landlords, such as the present defendant.
2. Defendant contends that the ordinance (Sec. 982), involved in Case II, is invalid, since it does not provide who *460 shall notify it to "paint the walls and ceilings of the premises," nor does it set up any standard to govern the action of the Board of Health in requiring such painting.
But the ordinance, in the very same sentence wherein it requires such painting, requires the property owner to "cleanse all the rooms * * * as often as shall be required by said Board or its officers, and shall when notified so to do well and sufficiently whitewash or paint the walls and ceilings thereof." Obviously, it is the "Board or its officers" by whom defendant is to be "notified." And, see also to the same general effect the general provision as to the enforcement of ordinances. (Chap. LXI, Sec. 972, City Ordinances, Revision 1913.)
As to the standard to be applied by the Board of Health in that regard, note first that the obvious purpose of such painting is not to satisfy the mere esthetic sense of the officer, as previously indicated, but is to make sure that the property owner, by painting and otherwise, shall thoroughly cleanse all the rooms of disease vectors among others. Clearly, the provision of the ordinance that the defendant shall paint the walls "well and sufficiently" prescribes a reasonably adequate practical standard.
3. Defendant contends that the ordinance involved in Case III (Sec. 1069) is invalid, since it subjects defendant to a penalty, without notice of the standards with which it should previously comply, in order to avoid the imposition of the penalty. So far as pertinent, the section provides "whatever is dangerous to human life or health * * * is hereby declared to be a nuisance. Any person * * * who shall continue to retain or maintain any of them shall on conviction thereof forfeit and pay a penalty * * *." Thereunder defendant was complained against, and convicted of, maintaining defective plastering of certain walls, and a coal stove with a crack in it.
In the first place, we find not a word in the ordinance as to defective plastering or defective stoves. In the next place, we find nothing to indicate to the defendant, or *461 to any other person proceeded against under the ordinance, what structures or conditions are deemed to be "a nuisance" as `dangerous to human life or health." Since almost every object or mechanical contrivance could, under certain conditions, be dangerous to human life or health, and its maintenance in the past thereby render a person subject to prosecution in the future and the imposition of a penalty under such ordinance, how can a property owner possibly take steps to protect himself from violating such ordinance? To put the matter more technically, it is of the essence of due process of law, that before a personal conviction, there shall be a hearing given the party proceeded against, and that before such hearing, he shall have due notice, not only of the hearing, but of the standard with which public policy has insisted he comply. In this regard, our highest court has recently said "While there is no doubt that the legislature may delegate to an administrative body the exercise of a limited portion of its legislative power with respect to some specific subject matter, such delegation of legislative power must always prescribe the standards that are to govern the administrative agency in the exercise of the powers thus delegated to it." State by Van Riper v. Traffic Telephone Workers' Federation of N.J., 2 N.J. 335, 353 (Sup. Ct. 1949). See also Panama Refining Co. v. Ryan, 293 U.S. 388, 79 L.Ed. 446 (Sup. Ct. 1935); State v. Larson, 10 N.J. Misc. 384 (Essex Co. Ct. of O. & T. 1932).
Here, on the contrary, the municipal ordinance lays down no pertinent standard whatever to guide its officials in performing their duty of inspection and prosecution, or to guide the citizens of Newark in maintaining their properties with due regard to the public health and welfare. Even assuming the city's claim to be correct that the Legislature can validly delegate to the Board of Health limited powers to fix the policy as to health standards, this only means that these standards, essential to due process, need not be fixed in full detail by the State Legislature, but that these then must be fixed to a reasonable extent in the ordinance. This the ordinance *462 in question has entirely failed to do. Nor, can the city take comfort from its power to abate and remove nuisances generally. (R.S. 26:3-49; R.S. 40:48-2.3 et seq.) The action here taken was neither an abatement nor a removal, but the imposition of a penalty. The nuisance itself is not affected by the penalty. It is one thing to condemn a piece of property as dangerous to the public; it is another to condemn an individual. This latter cannot be constitutionally done, until that individual is put on notice of the standard of good citizenship to which he should adhere, in order not to be condemned.
Sec. 1069 of the Revised Ordinances of the City of Newark (Revision of 1913), insofar as it affects defendant in the prosecution appealed from, is hence unconstitutional and void. But, the other ordinances, insofar as involved in the prosecutions of defendant here appealed from, and such prosecutions themselves, are a valid exercise of the police power of the State, delegated to the City of Newark by the statutes.
Defendant's convictions in Cases I and II are accordingly sustained; that in Case III reversed.
NOTES
[1] "3. Hot Water Supply: In any building where the owner, lessee, sub-lessee or other person is obligated by rental, lease or contract, to furnish a supply of hot water to the plumbing fixtures, such hot water shall be supplied at a temperature of not less than ninety degrees (90° ) Fahrenheit, between the hours of six o'clock a.m. and ten o'clock p.m.

"In all buildings the hot water storage tank, the hot water pipes and the hot water heating apparatus, shall be kept at all times in good, workable condition, free from leaks or any other defects.
"Where such hot water is heated by the lessee, sub-lessee or other person, the owner shall maintain in good workable condition, free from leaks or any other defects, the hot water storage tank, hot water pipes and the hot water apparatus."
[2] "Sec. 982: Every dwelling and factory building and every part thereof, and the yard, court, passage, and area or alley connected with the same, shall be kept clean and free from any accumulation of dirt, filth, garbage, or other matter. The owner, agent, lessee or occupant of any dwelling or factory building or part thereof shall thoroughly cleanse all the rooms, passages, stairs, floors, windows, doors, walk, ceilings, privies, cesspools, and drains thereof, as often as shall be required by said Board or its officers, and shall when notified so to do, well and sufficiently whitewash or paint the walls and ceilings thereof.

"Any person or persons, firm or corporation convicted of a violation of this section shall forfeit and pay a penalty of not more than ten dollars for the first offense and of not more than twenty-five dollars for each subsequent offense."
[3] "Section 1069: Whatever is dangerous to human life or health, and any building, erection, or part or cellar thereof, not provided with adequate means of ingress and egress, or not sufficiently supported, ventilated, drained, cleaned or lighted, and whatever renders food or water unwholesome, is hereby declared to be a nuisance.

"Any person or persons or corporation who shall aid in erecting or contribute to, or who shall erect, or contribute to, or who shall continue to retain or maintain any of them, shall, on conviction thereof, forfeit and pay a penalty not exceeding twenty five dollars."
[4] "Q. In short, porous walls harbor lice, and lice are vectors of disease? A. Yes. This type of walls cannot be washed properly. Painting is a necessary means for the prevention of the spread of disease.

"Q. Would painting prevent the harboring of the lice? A. Yes, in this manner, that where a wall is of a porous nature, the painting has a tendency to cover up the porous condition of the wall, and it prevents any lice in there from getting out and then prevents the nesting of these vectors."
[5] The City Charter of the City of Newark, P.L. 1857, c. 52, pp. 131, 133, Title Third: "Sec. 31. And be it enacted, That the common council shall have power within the said city to make, establish, publish and modify, amend or repeal ordinances, rules, regulations and by-laws for the following purposes:

"XXI. To establish a board of health, to define its powers and duties, and provide for the protection and maintenance of the health of the city.
"XXII. To abate or remove nuisances of every kind, and to compel the owner or occupant of any lot, house, building, shed, cellar or place wherein may be carried on any business or calling, or in and upon which, there may exist any matter or thing which is or may be detrimental to the health of the inhabitants, to cleans, remove, or abate the same, from time to time, as often as they may deem necessary for the health of the inhabitants of the city, at the expense of the owner or occupant thereof."
R.S. 40:116-6: "In addition to any and all powers conferred by subtitle 3 of this title (Sec. 40:42-1 et seq.), or by any other law, the board of commissioners may make, amend, repeal and enforce ordinances and regulations: to
"a. Promote and insure the security, health, government and protection of such municipality and its inhabitants."
R.S. 40:48-2: "Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law."
R.S. 26:3-33, as amended by P.L. 1949, c. 94, § 1: "Local boards of health may within their respective jurisdictions:
"a. Secure the sanitary condition of every building, public or private."
R.S. 26:3-64: "The local board of health may enact and amend health ordinances, and make and alter necessary rules and regulations in the execution of any power delegated to it or in the performance of any duty imposed upon it by law, subject to the limitations specified in section 26:2-23 of this title. An ordinance or rule of the local board shall be in force only within the jurisdiction of the board which enacts it."