**CITY OF ST. LOUIS, Respondent,**

v.

**Paul F. BRUNE, Appellant.**

**Nos. 57428, 57429.**

Supreme Court of Missouri,
En Banc.

Nov. 12, 1974.

Robert C. McNicholas, Jack L. Koehr, City Counselors, Raymond J. Issa, Asst. City Counselor, St. Louis, for respondent.

J. E. Sigoloff, St. Louis, for appellant.

HENRY I. EAGER, Special Commissioner.

The defendant, appellant, was convicted in the St. Louis Court of Criminal Correction of two violations of a St. Louis Ordinance prescribing minimum housing standards. The violations allegedly arose from the operation of two different apartment buildings. Section 390.080 of Ordinance 51637 forbade any owner of such properties to permit the occupancy of any dwelling units which were not in compliance with the ordinance; Section 391.040 required that every dwelling unit "shall have a tub or shower bath in good working condition, properly connected to approved hot and cold water and sewer systems in the toilet room or in a separate room adjacent to such dwelling unit." Defendant concedes that his units did not and do not contain tubs or showers so connected. They apparently did contain "water closets" and that is not an issue here. Separate violations were charged as to defendant's buildings at 3917–3921½ Finney (Avenue) containing six units or apartments, and at 4030–32½ Finney containing six units, the latter of which seems also to have abutted on Fairfax and is thus referred to rather confusingly at times. The cases were tried together without a jury, the Court found defendant guilty in each case and assessed a fine of $100 and costs against him in each case. No special findings were requested or made. Defendant filed motions to set aside the judgments and for a new trial, specifically raising the point that the Court had erred in sustaining the validity of Section 391.040, supra, because it was unreasonable, arbitrary and confiscatory, that it bore no reasonable relationship to health, welfare or safety, and that it denied to defendant due process under the 14th Amendment to the United States Constitution and took his property for public use without just compensation. Substantially identical allegations had been made in the answers filed by defendant to the informations. The motions were overruled and defendant duly appealed. The cases have been docketed and considered together in this Court. We have jurisdiction because of the constitutional question and the time of the filing of the notices of appeal.

This case has been here previously. See 466 S.W.2d 677 (Mo.1971). The defendant had raised the constitutional issue there and the Court clearly defined the problem. However, the trial court had excluded much evidence offered by the defendant to support its contention, and in fact it would seem to have excluded nearly all of defendant's proferred evidence. This Court declined to rule on the merits on the record as there presented and reversed and remanded the case, holding that such evidence was relevant and admissible. Following the retrial, we have the present appeal. Considerable evidence was received but the record still leaves much to be desired. Some features have not been completely developed, and the transcript is replete with handwritten deletions, additions and corrections, some apparently necessary to attain a reasonable degree of clarity. The parties have approved the transcript and we accept it for what it may be worth. By a stipulation added to the transcript it is stated: that the city subpoenaed defendant's books, records etc., reflecting the income and expenses on these properties for the years 1950 through 1969, and also all books, records etc., reflecting similar information for properties "within a 3 block vicinity * * *," in which defendant had a controlling or managing interest; that defendant failed to produce such records, and that the plaintiff "by agreement and stipu-

lation with defendant's attorney" moved for an order striking all of defendant's testimony as to income, rent and expenses relating to the two properties here involved, and that said motion was sustained. The transcript contains a brief statement that plaintiff "by agreement" moved to strike out all evidence of defendant "as to income received from property in issue memorandum in file." Several rather peculiar features thus appear in this part of the procedure, but since defendant raises no point whatever concerning it, we shall, with some doubt, disregard his evidence regarding income and expenses. Actually, there is not much, anyway.

It may simplify matters to refer to 4030–4032½ Finney as tract 1, and 3917–3921½ Finney as tract 2. A city building inspector testified at some length, but it is not necessary to review his testimony in detail. Defendant admitted that the buildings did not comply with the ordinance in the respects designated, and he assumed responsibility as the actual owner. This witness for the city was familiar with the properties on both sides of Finney from Vandeventer to Sarah and stated: that "the properties in the area are in a vandalized condition * * *," apparently meaning most of them; that probably four to six buildings have been razed; and that there were sundry vacant lots. A group of many photographs was identified and received as an exhibit; these supposedly represented buildings and vacant lots on Finney and Fairfax in the immediate vicinity of these properties. The witness recognized some of them. They show buildings with windows and doors boarded up, windows broken or entirely knocked out, and badly dilapidated conditions generally. The witness thought some of these buildings had contained baths, but that this did not prevent their "vandalization"; he did not know whether the absence of tubs or showers and hot water might contribute to the vacancies, but recognized that some people were willing to pay very low rents with little or no improvements.

From the defendant's testimony we note the following as its substance: that he had been engaged in real estate ownership and management for 61 years; that he had made many real estate loans; that he acquired tract 1 on April 18, 1952, and tract 2 on October 15, 1950; that he thought there were then no vacant lots; that most of his tenants are living on social security or aid to dependent children, although a few work; that neither property *has any sale value* or loan value, and there are no buyers for them at any price; that the condition of the neighborhood "has something to do with it"; that when a building there becomes vacant it *immediately disappears,* for the vandals steal everything and tear it up; that he had an estimate on the cost of installing the required equipment and that it ran from $1,200 to $1,300 per unit, or $7,800 per building; that each building is about 70 years old, with a probable life of four or five years if not vandalized sooner; that the improvements demanded would not increase the market value, for there would still be no buyers; that he would have to charge about $60 a month rentals to pay for the improvements over a five-year period and it would not be possible to get it; that if the buildings were not rented and became vacant, they would "disappear"; that in a two-block area on Finney and Fairfax he had found about 39 buildings vacant and vandalized and a number of vacant lots; that people don't want to live there; that he recently sold a ten-unit building "with baths" for $1,800 at 3115–3123 Brantner, a two-family building on 22nd Street for $500, and (apparently) a building at 2514 N. Market for $1,500. Defendant further testified that his father and mother lived to the respective ages of 87 and 85 without having any baths connected to pipes and that he had none until he was 21.

A physician, Dr. Herman Blumenthal, specializing in pathology, testified for defendant: that the purpose of bathing is to remove dirt; that bathing can be done in various ways, and that "there is no special

effect in method"; that there is no medical requirement of pipes and a tub; that hot and cold water can be used in any tub or container, and that the absence of a tub or shower from an apartment unit would not, in his opinion, be detrimental to the occupants. A plumbing contractor testified that his estimates for installing tubs, waterlines and heaters, with wash basins, was $800 per unit or $4,800 for a six-unit building. A general contractor estimated the cost of removing and rebuilding the walls, entrances, floors, etc., in making such improvements at $410 per unit or $2,460 for a six-unit building; he further testified that this would reduce each kitchen to about the size of a closet.

In rebuttal, the city produced Dr. William Blanton who testified: that any dwelling unit without hot water is detrimental to health because of the relative difficulty in removing bacteria without it; that bathing is necessary from a public health standpoint, and that one cannot effectively perform the function of bathing without a tub or shower connected to hot water. The foregoing constitutes the essential evidence.

As said by Judge Donnelly in 466 S.W. 2d at l. c. 678: "The problem of attempting to reconcile the quest for adequate housing for tenants with protection for the property rights of landlords has drawn the attention and consideration of the scholars and of the courts * * *

"The essential question presented 'is whether the ordinance in question is fairly referable to the police power of the respondent municipality, and whether the expressed requirements or regulations of the ordinance have a substantial and rational relation to the health, safety, peace, comfort, and general welfare of the inhabitants of the municipality.' * * * *"

Certain principles seem to have been more or less generally accepted; these are, in substance, the following. Owners of property hold it subject to the reasonable exercise of the police power. The ordinance or other law must, as stated above, bear a reasonable and substantial relation to the public health, welfare or safety; if it does, the power may be exercised without compensation. The cost of the improvement to the owner is not alone decisive of the question, but it may be a material element in a consideration of the reasonableness of the law. In the first instance the legislature has a rather wide discretion and, while the courts may invalidate such a law if arbitrary and unreasonable, they will not in so doing substitute their judgments for those of the legislative bodies; and there is a presumption of constitutionality. On the other hand, there comes a point where the reasonable exercise of the police power ceases, the enforcement of the law becomes confiscatory, and only the right of eminent domain remains; and differences in "degree" constitute material distinctions.

We have examined the many cases cited pro and con by the parties. A discussion of the facts of those cases would be an interminable task. There are no Missouri cases based on similar facts. In Kalbfell v. City of St. Louis, 357 Mo. 986, 211 S. W.2d 911 (1948), an order closing a building for use as a movie theatre was upheld because of violations of the city's safety requirements, and the Court held that these requirements might be applied to an existing building. In City of St. Louis v. Nash, 260 S.W. 985 (Mo.1924), an ordinance required "privies" to be removed and replaced by modern "water closets" where sewers were available. Sewers were available and the ordinance was held valid and applicable to defendant's existing property. The situation there was extreme, and it constituted an obvious danger to public health. The Nash case was followed with approval in City of St. Louis v. Hoevel Real Estate & Building Co., 59 S.W.2d 617 (Mo.1933), on somewhat similar facts.

In general, the following requirements have been held valid in other states as to existing buildings, usually apartments or "tenement" houses; rent regulation (Block

v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L. Ed. 865 (1921)); safety and sanitary improvements costing $5,000 on a forty-room tenement assessed at $13,500, details not explained (Adamec v. Post, 273 N.Y. 250, 7 N.E.2d 120 (1937)); water on each floor in suitable "appliances" (Health Dept. of the City of New York v. Rector, Church Wardens and Vestrymen of Trinity Church, 145 N.Y. 32, 39 N.E. 833 (1895)); a tub or shower, sink, and toilet with running water (Richards v. City of Columbia, 227 S.C. 538, 88 S.E.2d 683 (1955) a 3–2 decision); separate lavatories, adequate tubs, sinks (Apple v. City & County of Denver, 154 Colo. 166, 390 P.2d 91 (1964)); demolition of building which had become a nuisance (Perepletchikoff v. City of Los Angeles, 174 Cal.App.2d 697, 345 P.2d 261 (1959)); adequate fire escapes (City of Seattle v. Hinckley, 40 Wash. 468, 82 P. 747 (1905)); prohibition of glass panel doors (Kaukas v. City of Chicago, 27 Ill.2d 197, 188 N.E.2d 700 (1963)); central heat or approved water heater (Danker et al. v. City of New York et al., 20 Misc.2d 557, 194 N.Y.S.2d 975 (1959)); tub or shower with hot water (Givner v. Com. of Health, 207 Md. 184, 113 A.2d 899 (1955)); hot water and screens in "cold water flats" (Paquette v. City of Fall River, 338 Mass. 368, 155 N. E.2d 775 (1959)); tub or shower, sink, lavatory and water heater (Wheat v. Ramsey, 284 Ala. 295, 224 So.2d 649 (1969)); tub or shower and hot water (City of Louisville v. Thompson, 339 S.W.2d 869 (Ky.1960)); hot water "apparatus" (City of Newark v. Charles Realty Co., 9 N.J. Super. 442, 74 A.2d 630 (Essex County, 1950)); water closet for each apartment (City of Newark v. Zemel, 17 N.J.Super. 295, 86 A.2d 36 (Essex County, 1952)).

We note here that in Apple, Perepletchikoff and Paquette, supra, the respective courts said that the law must not be unreasonable as applied to the individual owner and his property; and in Paquette the Court also said that in so broad a field it did not make a declaration applicable to all, but only as the ordinance applied to the plaintiff. See also Dente v. City of Mt. Vernon, 50 Misc.2d 983, 272 N.Y.S.2d 65 (1966).

In Safer v. City of Jacksonville, 237 So. 2d 8 (Ct.App.Fla.1970), the city had charged many violations of a municipal housing code, but the ones principally discussed were the absence of lavatories in some units and the lack of hot water to lavatories, tubs or showers in others. The building was valued at about $40,000, and all of the required improvements would have cost approximately $20,000; some of the tenants had been there for 30 years. A jury found that most of the supposed defects were insubstantial. The Court on appeal held that the failure to furnish hot water to the tubs or showers did not adversely affect the health of the tenants, that in this respect, and in view of the cost, the ordinance bore no reasonable relation to the public health and welfare, and that its enforcement would be confiscatory.

In Dente v. City of Mt. Vernon, 50 Misc.2d 983, 272 N.Y.S.2d 65 (Sup.1966), the Court held unconstitutional, as applied to plaintiff's property, an amended ordinance which required a tub or shower, hot water and a wash basin in all apartment units. Plaintiff owned a building with eleven three-room units, all of which had toilets. The additional cost would have been about $11,000. The Court noted that "there comes a point at which the police power ceases * * *," and that such regulations "might amount to a taking without due process of law," quoting from Block v. Hirsh, 256 U.S. 135, 156, 41 S.Ct. 458, 460, 65 L.Ed. 865. The Court also cited Rideout v. Knox, 148 Mass. 368, 19 N. E. 390 (1889), in which the Court said that "* * * difference of degree is one of the distinctions by which the right of the legislature to exercise the police power is determined," and that the larger limitations of existing rights may be imposed only by the exercise of the right of eminent domain. The gist of the Dente opinion was that the urgency of the evil to be corrected

should be weighed against the cost to the property owner, and the Court there found the ordinance invalid as applied to the plaintiff. There was no "manifest evil," even under the New York Multiple Dwelling Law, McKinney's Consol.Laws, c. 61–a.

Our legislature adopted in 1969 a so-called "Minimum Housing Code Standards," Sections 441.500–441.640, RSMo 1969, V.A.M.S., (pocket parts), effective August 13, 1969, to which certain amendments were made in 1971. This law was not effective at the time of the supposed violations charged in these cases. However, and of more importance, the act does not provide any minimum health or safety standards for housing, but does enact a procedure by which a municipality may, through its "Code Enforcement Agency" (or one-third of the tenants of the dwelling units involved), file a civil suit for the abatement of an existing nuisance; therein, if the Court finds that such a nuisance exists it may appoint a receiver and order the rents to be deposited with the clerk, pending corrections. This act has no effect upon our issues.

■ As held in some of the cases, supra, we do not in this opinion decide the validity of the ordinance generally; its effect and its reasonableness vary as to each property affected, and a decision must be made on each separate state of facts as they arise. As to the two properties involved here, we have decided that the application of that part of Section 391.040, quoted above, would be arbitrary and unreasonable and hence a deprivation of due process to the defendant.

We recognize that in all probability a majority of the cases involving the general question (but certainly not on identical facts) have held such ordinances to be valid. We have determined that the facts as stated here impel us to a contrary conclusion. These buildings have no sale value, and no loan value. The buildings are 70 years old. No one will purchase them and people simply do not want to live in that

neighborhood. This evidence, though coming from the defendant himself, is uncontroverted and we accept it. The locality has been largely vandalized and many of the buildings are vacant. When a building becomes vacant it is almost immediately vandalized and, as defendant said, it "disappears." Most of defendant's tenants are living on welfare or social security. This record does not show that any tenants have complained of existing conditions; they apparently do have flush toilets and lavatories with hot and cold water. The cost to defendant of the improvements demanded would total approximately $7,800 for each building, according to defendant's testimony. This figure was objected to as hearsay, but estimates had been received and defendant was an experienced real estate operator and owner. The evidence was admissible. Also, according to two witnesses who actually made estimates, the total cost of the improvements so estimated would total $7,260 per building. In the alteration the kitchens would be reduced to "closet" size. There was testimony from the defendant that in order to recoup such expense, he would have to charge monthly rentals of $60 over a five-year period and that this was simply not obtainable. The net result would seem to be vacancies, vandalism, and probably a total loss of the buildings.

The problem here is not actually one of public health; it is wholly different from those cases involving outside privies, sewage, etc. While the situation is by no means ideal, it really involves a matter of inconvenience to those tenants who choose to pay a minimum rent in return for incomplete facilities. The tenants may still bathe if they want to, and we are not convinced of any great danger that diseases will be spread.

■ In conclusion, we hold that the part of § 391.040 of Ordinance 51637 first quoted herein (tub or shower connected to approved hot and cold water and sewer systems) is unconstitutional *as applied to*

*these two properties*; this, for the reason that it is unreasonable, arbitrary and confiscatory as so applied, and consequently a deprivation of due process; and that, as so applied, it would have no substantial or reasonable relationship to the public health, welfare or safety.

The judgments appealed from are reversed and the cases are remanded with directions to discharge the defendant.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commission, is adopted as the opinion of the Court en Banc.

DONNELLY, C. J., and MORGAN and HOLMAN, JJ., concur.

HENLEY, J., concurs in separate concurring opinion filed.

FINCH, J., dissents in separate dissenting opinion filed.

SEILER and BARDGETT, JJ., dissent and concur in separate dissenting opinion of FINCH, J.

HENLEY, Presiding Judge (concurring).

I concur, because I believe that under the facts and circumstances of this case it would be unreasonable and confiscatory to require application of these minimum housing standards to defendant's property.

The facts and circumstances I have reference to are that defendant's buildings are located in an area which has become a slum, partly, at least, because the city has not been able to protect other buildings in the area from vandalism. This creeping process of a building becoming vacant and its then being rendered useless by vandals is a cancer which slowly but surely is rendering the neighborhood unlivable. It is obvious that if defendant spends money on the property to bring it in compliance with the minimum standards, he will have to increase the rental charge to tenants who, because they are unable to pay more rent, will leave and create another vacant building for destruction by the same process. To require defendant to comply with the city's minimum housing standards in this area will be to cause him to make improvements, the apparent result of which will be to create a condition which will attract vandals (against whom the city is unable to protect his property) who will destroy not only the improvements but also (for all practical purposes) his whole property.

FINCH, Judge (dissenting).

On this appeal, defendant contends (1) that the ordinance under which he was prosecuted bears no reasonable relationship to public health, welfare or safety and is an invalid and unconstitutional exercise of the police power and (2) that even if the ordinance is valid, its application to defendant's properties results in an unconstitutional taking of property without due process when the cost to defendant is compared to the object to be attained.

The principal opinion concludes that it is not necessary to rule on the validity of the ordinance generally but upholds defendant's contention that the ordinance as applied to defendant's two properties is unreasonable, arbitrary, and confiscatory and, consequently, is a deprivation of property without due process.

I would hold against defendant on both of his contentions and would affirm the judgment of the trial court. Hence, I respectfully dissent from the principal opinion.

At the outset it should be noted that the rule is well settled that private rights are subject to valid exercise of the police power; that the propriety, wisdom and expediency of legislation enacted pursuant to police power is for legislative rather than judicial determination; that there is a presumption of validity of such acts which one attacking has the burden to overcome;

and that such an act will be declared invalid only if it is clearly shown to be unreasonable and arbitrary. This rule is well expressed in Poole and Creber Market Co. v. Breshears, 343 Mo. 1133, 1146, 125 S. W.2d 23, 30 (Mo.1938) as follows:

"It is argued by appellant that the legislature in enacting the sections of the statute in question exceeded its constitutional power in that said sections 'are not a proper exercise of the police power, having no relation to the preservation of the health, morals, safety or welfare of the public.' The police power, as we have said, is to be exercised within wide limits of legislative discretion. It has been said to be the most essential of powers, at times the most insistent, and always one of the least limitable of the powers of government. The statute in question is referable to that power and it will be presumed to be valid unless invalidity is clearly made to appear, as we have shown. It is assailed as having no relation to the public health or to the prevention of fraud and deceit. Primarily the determination of whether or not the public health may be injuriously affected or whether the public may be defrauded or deceived by the manufacture and sale of an article is for the legislature. It is the duty of the court to sustain the law unless it clearly appears to be arbitrary and unreasonable or passed for some ulterior purpose and not in the interest of the general welfare, or to have no relation in fact to the purported legislative purpose. These propositions are well established. If the situation is such that a fairly debatable question is presented, then it is for the legislature to determine, and the court should not interfere, even if, in its opinion, the conclusion of the legislature is an erroneous one."

See also Borden Co. v. Thomason, 353 S. W.2d 735 (Mo. banc 1962); Passler v. Johnson, 304 S.W.2d 903 (Mo.1957).

This court previously has held that the City of St. Louis has authority to adopt and enforce ordinances relating to building requirements which were designed to protect public health, welfare and safety. In City of St. Louis v. Hoevel Real Estate & Building Co., 59 S.W.2d 617 (Mo.1933) the court upheld the prosecution of defendant for operating three tenement buildings with facilities for 25 families but in which the defendant, instead of providing a "water closet" connected to the sewer for each unit as required by ordinance, simply maintained three privy vaults connected with the sewer. The defendant contended that the ordinance requirement violated certain state and federal constitutional rights and was therefore invalid. In overruling that contention this court said, 59 S.W.2d l.c. 618:

"* * * The section was formerly section 1786 of the Revised Code 1914, and its constitutionality was under consideration in St. Louis v. Nash (Mo. Sup.), 260 S.W. 985, 986. In that case, as in this case, the defendant was charged with a violation of the section. In ruling the question we held that the enactment was a valid exercise of the police power, and that the section was not in conflict with the State and Federal Constitutions. Furthermore, we held that 'in the exercise of police power of the state, a municipality may lawfully require a property owner to alter or reconstruct an existing building without compensation, when such alteration or reconstruction is reasonably necessary to insure the public safety or to protect the public health.' We adhere to our ruling in that case."

Subsequently, in the case of Kalbfell v. City of St. Louis, 357 Mo. 986, 211 S.W.2d 911 (1948) the court dealt with an ordinance requirement with respect to buildings used for motion picture theaters. Defendant's theater was closed by municipal officials because continued occupancy of the structure for that purpose conflicted with the city building code requirements intended to safeguard the public against such hazards as fire and panic. On appeal

this court upheld the action of the trial court in closing the structure for occupancy as a moving picture theater but reversed that portion of the trial court's judgment which ordered demolition of the building for the reason that other uses of the building were possible within the terms of the building ordinance. The court not only upheld the validity of the ordinance as a proper exercise of the police power but held that it could apply to existing as well as newly erected structures. In so holding the court said, 211 S.W.2d l.c. 917:

"We need not detail existing charter provisions. It is sufficient to state that the City of St. Louis is vested with ample authority to define and abate businesses detrimental to the health or welfare of the citizens and all nuisances and causes thereof, and to enact proper police regulations, including specific authority to regulate the construction and materials of buildings and structures, inspect the same, and when necessary prevent the use thereof and require alterations to make them safe."

I do not understand that the defendant questions the foregoing decisions. Rather his position is that the ordinance here involved which required that dwellings have a tub or shower properly connected to hot and cold water is not reasonably necessary to protect the public health, welfare and safety and hence is not a proper exercise of the police power.

As noted in the principal opinion, there was evidence on behalf of the defendant that a tub or shower connected to hot water is not essential to public health. The doctor who was a witness for defendant testified that while bathing and cleanliness are necessary to prevent infection and disease, they can be accomplished in unconnected tubs into which heated water is poured or by sponge bathing as is done in hospitals. In further support of his position, defendant testified to the fact that his father and mother lived to the ages of 87 and 85 respectively without ever having in their home any baths connected to hot and cold water pipes and that the defendant himself, who was now 72 years of age, had no such baths until he was 21.

On the other hand the doctor who is commissioner of health for the City of St. Louis testified on behalf of the City that such a properly connected tub or shower in every dwelling is essential for proper bathing of the public; that the lack thereof is detrimental to public health; and that the absence of such facilities is conducive to the spread of disease and infection, because without them people probably will not bathe adequately by some alternative means.

Under the testimony in this case it is at least fairly debatable that the requirement of a properly connected tub or shower in each dwelling is reasonably related to public health, welfare and safety. This being true, the rule announced in Poole and Creber Market Co. v. Breshears, supra, that when the situation is fairly debatable "it is for the legislature to determine, and the court should not interfere, even if, in its opinion, the conclusion of the legislature is an erroneous one" is applicable. Accordingly, I would hold valid Sec. 391.040 of the St. Louis ordinance prescribing minimum housing standards.

The view that a building code provision requiring dwellings to have bathing facilities properly connected to hot as well as cold water is a reasonable exercise of the police power is supported by a majority of the appellate court decisions in other states which have passed upon this question. A number of these are referred to in the summarization of cases in the principal opinion. These include Givner v. Commissioner of Health, 207 Md. 184, 113 A.2d 899 (1955); Paquette v. City of Fall River, 338 Mass. 368, 155 N.E.2d 775 (1959); Wheat v. Ramsey, 284 Ala. 295, 224 So.2d 649 (1969); City of Louisville v. Thompson, 339 S.W.2d 869 (Ky.1960); Richards v. City of Columbia, 227 S.C. 538, 88 S.E. 2d 683 (1955) and Apple v. City and Coun-

ty of Denver, 154 Colo. 166, 390 P.2d 91 (banc 1964). The case of Safer v. City of Jacksonville, 237 So.2d 8 (Fla.App.1970), referred to in the principal opinion as expressing a contrary view, contains dictum to the effect that to hold that such facilities are essential to health does violence to the early history of our county when people got along without bathing facilities of this character, but that was not the basis on which the court decided the case.[1] An analysis of the decision shows that the parties stipulated that the question of whether alleged violations charged against plaintiffs in any manner materially jeopardized or adversely affected the health and safety of any tenant should be submitted to the jury and that the court held that since the jury resolved those questions against the City, it was bound thereby and could no longer contend that the defects found constituted violations of the code. The other case cited in the principal opinion as holding such an ordinance unconstitutional is Dente v. City of Mount Vernon, 50 Misc. 2d 983, 272 N.Y.S.2d 65 (1966). This is simply a reported decision of a trial court and is not an appellate decision by the State of New York on this subject.

Defendant next contends that even if the ordinance is valid, its application to these properties results in taking his property without due process of law. This contention is asserted on the basis that his buildings are in a rundown, vandalized neighborhood; that he now collects only $32–35 per month per apartment; that it would cost approximately $1,200 per unit to make the installations required by the ordinance; that his buildings have no market value now and that these expenditures would not be recoverable by sale of the property; that to recover his investment he would have to charge $60 per month, but he could not collect this larger sum; and that the

result would be that his building would become vacant and would be vandalized and he then would lose his investment.

In essence, what defendant is saying is that even though this ordinance imposes standards of construction found to be essential to the protection of the public health and safety and even though dangerously adverse effects on the health of some of the public could result from nonenforcement of these standards, still such requirements should not be enforced when the condition of a building is so bad that it is economically unfeasible for the owner to make the changes required by the ordinance. It seems to me that the mere statement of this proposition furnishes its own answer. Clearly this would not be the case if we were dealing with replacing outside privies with inside toilets. Elimination of the hazard to public health in such an instance would not yield to the economic plea of the property owner. The same should be true of other requirements reasonably necessary to protect the public health and safety. It follows that if it be decided that a particular building requirement is not arbitrary and unreasonable and is a proper exercise of the police power to protect the public health and safety, its enforcement should not depend upon the economic situation of or the economic results to the owner of the property. To hold to the contrary means that the worst housing is exempted from public health and safety requirements and that the hands of the City are tied when it attempts to require that tenements be brought to minimum standards.

The Supreme Court of Colorado addressed this question thus in Apple v. City and County of Denver, supra, 390 P.2d 1. c. 94:

"To hold that existing buildings are exempt from ordinances which impose

---

1. Furthermore, to hold that such a building code requirement is not reasonable police power regulation because people got along with such facilities in earlier days and because some lived to a ripe old age overlooks the fact that the general life expectancy was much lower

then than now and that the tremendous increase in urban concentration has created a need for much more emphasis on establishing required standards in order to protect the public health, welfare and safety.

standards designed to protect the safety and welfare of the public would in effect permit those whose actions are dangerous to the health and safety of the community to continue their deleterious conduct unchecked. We cannot agree that it is beyond the police power to reach such conduct."

One of the landmark cases relating to the validity of building codes designed to protect the public health and safety is Adamec v. Post, 273 N.Y. 250, 254, 7 N.E.2d 120, 122, 124 (1937) in which that court stated:

"* * * [T]here has come a general recognition that dwellings which are unsafe or unsanitary or which fail to provide the amenities essential to decent living may work injury not only to those who live there, but to the general welfare. * * * At the point where economic self-interest ceases to be a sufficiently potent force for the promotion of the general welfare, * * * the Legislature may intervene and require that buildings intended for use as tenement houses or multiple dwellings shall conform to minimum standards which may reasonably be regarded as essential for safe, decent, and sanitary dwelling places.

\* \* \* \* \* \*

"* * * The power of the State to place reasonable restrictions upon the use of property for the promotion of the general welfare is no longer subject to challenge and regulations governing the erection or use of buildings as multiple dwellings which are reasonably calculated to safeguard the public health and safety constitute a proper exercise of that power.

\* \* \* \* \* \*

"The imposition of the cost of the required alterations as a condition of the continued use of antiquated buildings for multiple dwellings may cause hardship to the plaintiff and other owners of 'old law tenements' but, in a proper case, the Legislature has the power to enact provisions reasonably calculated to promote the common good even though the result be hardship to the individual."

I find nothing in the record to show that the requirement by the City with respect to properly connected bathing facilities is arbitrary or unreasonable and I would overrule defendant's second contention.